UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, DETROIT BRANCH, FRED
DURHAL, Jr., in his Official Capacity as MICHIGAN
LEGISLATIVE BLACK CAUCUS CHAIR, THE INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA
(UAW), LATINO-AMERICANS FOR SOCIAL AND
ECONOMIC DEVELOPMENT (LA SED), ANTHONY
BENEVIDES, RAQUEL CASTANEDA LOPEZ, ANGELITA
ESPINO, SHERRY G.DAGNOGO, KENNETH WHITTAKER,
CHRISTOPHER WILLIAMS,

       Plaintiffs,

v.                                                            Civil Action No.

RICK SNYDER, in his Official Capacity as Governor
of the State of Michigan, RUTH JOHNSON, in her Official
Capacity as Secretary of State for the State of Michigan,

       Defendants.

_____/

## VERIFIED COMPLAINT

### I.

### Nature of the Case

1.  This is an action to enforce Section 2 of the Voting Rights Act of 1965 (42 U.S.C. Sec.

    1973) and the Equal Protection Clause, and the One Person One Vote Standard of the

    Fourteenth Amendment (U.S. Const. Amend. XIV).  Plaintiffs seek declaratory and

    injunctive relief against implementation of the Michigan Legislative Redistricting Plan,

for the Michigan House of Representatives (SB 498), on the grounds that in the
Redistricting Plan:

(A) The State stripped minority voters of their right to select candidates of their choosing
by creating districts that will force-out 50% of the minority Representatives to the
State House from the City of Detroit (35% of all minority State Representatives in
total, statewide) in the August 7, 2012 Primary Election, compared to 2.083% (2 out
of a total of 96) of white candidates forced-out state-wide. The State ignored the
maps submitted by the Michigan Legislative Black Caucus ("MLBC" or "Black
Caucus") which had no incumbency pairings and which scored higher than the State's
maps on the objective "Apol" standards for adherence to principles of contiguity,
compactness, adjacency and the respecting of traditional political and municipal
boundaries (MCL 4.261). The State's conduct violated Section 2 of the 1965 Voting
Rights Act (42 U.S.C. Sec. 1973), the Fourteenth Amendment's Equal Protection
Clause, and the Fourteenth Amendment's One Person One Vote Standard. *Cox v.
Larios*, 542 U.S. 947 (2004), and

(B) The State has deprived Latino voters in Southwest Detroit of the ability to act in a
politically cohesive manner by willfully and knowingly creating House of
Representatives districts in the community that split the Latino community in half,
just as Latino voters have become the fastest-growing demographic in the City of
Detroit and the State of Michigan over the past 10 years. The State rejected a map
submitted by the Black Caucus which keeps the Latino community whole with a
42.74% Hispanic Voting Age Population base, and instead "cracked" the community,
by placing 24.5% of Latino voters in one district and 17.3% of Latino voters in

another, frustrating this community's ability to speak with a politically cohesive voice in Lansing. The State intentionally divided the rapidly-growing Latino community in Southwest Detroit in half, to diminish and weaken the political strength of Latino voters speak with a politically cohesive voice in Lansing. The State's action, in this respect, violates Section 2 of the 1965 Voting Rights Act, *supra*, as well as the Fourteenth Amendment's Equal Protection Clause. *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).

## II.

### Jurisdiction

2. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

3. Plaintiffs invoke the jurisdiction of this Court under 28 U.S.C. Sec's. 1331, 1343(a)(3) and (4), and 2201, this suit being authorized by 42 U.S.C. Sec's 1973j(f) and 1983.

## III.

### Parties

4. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

5. Plaintiff National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the oldest and largest civil rights organization in the United States, with more than 500,000 members and 2,200 Branches across the country and overseas. Article I, Section 3 of the NAACP constitution provides that the purpose and aim of the organization is to improve the political, education, social and economic status of minority groups, to eliminate racial prejudice, to keep the public aware of the adverse effects of

racial discrimination, and to take lawful action to secure its elimination.  Article IV,

Section 4 of the NAACP constitution specifically establishes a Legal Redress Committee

to utilize the courts to combat discrimination. The Detroit Branch, chartered in 1912, is

the NAACP's flagship Branch, being the largest and most active Branch in America.  The

Detroit Branch NAACP has, throughout its 99 year history, fought, through the

democratic process, for the cause of civil rights and equal treatment for all.  In particular,

the Detroit Branch NAACP has fought in the courts to preserve and protect voting rights

in the State of Michigan.  See, *NAACP v Austin*, 857 F. Supp. 560 (E.D. Mich.

1994)(challenge to state Redistricting Plan); *NAACP  v Michigan Republican State

Committee*, No. 05-74296 (E.D. Mich., 2005)(injunction granted to halt harassment of

African American voters at polling sites); *In re: Request for Advisory Opinion*, No.

130589 (Michigan Supreme Court, 2006)(*amicus curiae* opposition to photo

identification requirement for voting).

6.  Fred Durhal, Jr., is a resident of Detroit, Michigan, serves as Chair of the Michigan

Legislative Black Caucus, and is an elected Member of the Michigan House of

Representatives representing the 6th District.  The Black Caucus, founded in 1976, is

comprised of 25 Members from across Michigan, who serve in both the Michigan State

Senate and Michigan House of Representatives.  The MLBC has been at the forefront of

the fight for social and economic justice for all Michigan citizens. The MLBC was, from

the start, heavily engaged in the 2011 Legislative Redistricting Process.  It engaged

Counsel to advise it on the application of the 1965 Voting Rights Act, and engaged one

of the State's foremost experts on drawing redistricting maps. The Chair provided

testimony to the House and Senate Redistricting Committees, informing the Committees

4

that they must adhere to the protections afforded under the Voting Rights Act, as well as

the State Redistricting Statute – which has its own Voting Rights Act provision – and the

14th and 15th Amendments to the Constitution. The Black Caucus, counsel and mapping

expert met formally and informally with the Legislative Redistricting leadership

throughout the Redistricting Process.  The Black Caucus presented its own alternative

maps to the Redistricting Leadership; maps that complied with the requirements of the

Voting Rights Act and the Fourteenth Amendment.  The Black Caucus conducted its own

formal state-wide Redistricting Hearings in four jurisdictions across the State, to inform

the public about the Redistricting Process and to receive public input and comment.

7. With more than 390,000 active members and more than 600,000 retired members in the

United States, Canada and Puerto Rico, Plaintiff, the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") is

one of the largest and most diverse unions in North America, with members in virtually

every sector of the economy.  There are more than 750 local unions and 703 retiree

chapters in the UAW. The UAW currently has 2,500 contracts with some 1,700

employers in the United States, Canada and Puerto Rico.  UAW-represented workplaces

range from multinational corporations, small manufacturers and state and local

governments to colleges and universities, hospitals and private non-profit organizations.

Since its founding in 1935, the UAW has consistently developed innovative partnerships

with employers and negotiated industry-leading wages and benefits for its members.

UAW members have benefited from a number of collective bargaining breakthroughs,

including: the first employer-paid health insurance plan for industrial workers; the first

cost-of-living allowances; a pioneering role in product quality improvements; landmark

job and income security provisions; and comprehensive training and educational programs.

As impressive as it is, the UAW's success record at the bargaining table is only part of the story. From its earliest days, the UAW has been a leader in the struggle to secure economic and social justice for all people. The UAW has been actively involved in every civil rights legislative battle since the 1950s, including the campaigns to pass the Civil Rights Act of 1964, the Voting Rights Act of 1965, the Fair Housing Act, the Civil Rights Restoration Act of 1988 and legislation to prohibit discrimination against women, the elderly and people with disabilities.

Legendary UAW President Walter Reuther marched alongside the Rev. Dr. Martin Luther King Jr. as he sought to make America a more just nation.  Indeed, the UAW gave Dr. King office space at its headquarters at Solidarity House in Detroit where the Nobel Prize winner penned his 1963 "I Have a Dream" speech that remains firmly etched into our collective social consciousness a half century later.  Joined by Reuther and others, King spoke these words at Detroit's Walk to Freedom, two months before he gave his famous speech on Washington's Mall.  The connection between the labor and civil rights movements is natural. King was supporting sanitation workers in Memphis when he was assassinated.

UAW President Walter Reuther and United Farm Workers Union President Caesar Chavez shared a vision that transcended the boundaries of trade unionism.   The two unions began their relationship in the late 1960's when Reuther befriended Chavez during the Grape Boycott. In 1965 Mexican and Filipino workers, fed up with poor working

conditions and unfair pay, went on strike in Delano, California. Their heroic efforts gained the attention of Chavez. He took the fight to the streets, organized a march and urged farm workers across the nation to join the union. When news of the farm workers' plight reached Reuther, he threw his support behind the cause. The two organizations have marched together, fought together, and joined together in fighting for equal rights for more than four decades.

The UAW Human and Civil Rights Department enhances the union's efforts to ensure that all workers are treated fairly and that all have the same opportunity for advancement. The UAW's commitment to improve the lives of working men and women extends beyond its borders to encompass people around the globe. Through vigilant political involvement and coordination with world labor organizations, it continues to fight for enforcement of trade agreement provisions on human and worker rights, fair labor standards and a new approach to international trade — one that raises the quality of life for working people worldwide.

8.  Plaintiff Latino-Americans for Social and Economic Development, Inc. ("LA SED") has been one of the leading voices for Hispanics in Southeastern Michigan since the late 1960's as a civil rights advocate and as the provider of basic, but essential services to the community.  Its programs have included various youth development initiatives, senior citizen services, employment counseling, education and tutoring.  La Sed considers the right to vote and participate in the political process as a fundamental one, forming a necessary cornerstone to any viable community and ensuring that its citizens have a voice in community affairs.  As such, La Sed has actively encouraged and assisted the Hispanic immigrant community in Southeastern Michigan to fully participate in the political and

electoral process.  Therefore, any measures that seek to impair or prohibit participation in that process runs afoul of the principles, policies, and mission of La Sed, and in La Sed's view, does not pass constitutional muster.  For these reasons La Sed supports a challenge to the State's Redistricting Plan.

9.  Plaintiff Anthony Benevides is a Latino-American registered voter who resides in Southwest Detroit, who desires to participate in the electoral and political processes of Michigan on an equal basis with other residents.

10. Plaintiff Raquel Castaneda Lopez is a Latino-American registered voter who resides in Southwest Detroit, and who desires to participate in the electoral and political processes of Michigan on an equal basis with other residents.

11. Plaintiff Angelita Espino is a Latino-American registered voter who resides in Southwest Detroit, and who desires to participate in the electoral and political processes of Michigan on an equal basis with other residents.

12. Plaintiff Sherry G. Dagnogo is an African-American registered voter who resides in the City of Detroit, and who desires to participate in the electoral and political processes of Michigan on an equal basis with other residents.

13. Plaintiff Kenneth Whittaker is an African-American registered voter who resides in the City of Detroit, and who desires to participate in the electoral and political processes of Michigan on an equal basis with other residents.

14. Plaintiff Christopher Williams is an African-American registered voter who resides in the City of Detroit, and who desires to participate in the electoral and political processes of Michigan on an equal basis with other residents.

15. Defendant Rick Snyder is a resident of Ann Arbor, Michigan and is the Governor of the State of Michigan. As Governor he is the chief executive officer of the state and has the duty of seeing that the laws, including those pertaining to the Legislative Redistricting Process and the elections for the State Legislature, are faithfully executed. Defendant Snyder is sued in his official capacity.

16. Defendant Ruth Johnson is a resident of Holly, Michigan and is the Secretary of State for the State of Michigan. In this capacity she is the chief election officer of the state, and has the responsibility of overseeing the conduct of elections in the state. Defendant Johnson is sued in her official capacity.

## IV.

## Statement of facts

17. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

18. On August 9, 2011, Michigan Governor Rick Snyder signed into law SB 498 (the Redistricting Plan for the State Legislature), and HB 4780 (the Redistricting "Apportionment" Plan for Michigan's Congressional Delegation). The subject matter of this lawsuit is SB 498, "An act to divide this state into 110 representative and 38 senatorial districts [f]or terms of office beginning on or after January 1, 2013", and the illegal manner in which it drew district lines for the Michigan House of Representatives, within the City of Detroit.

19. The Redistricting Plan for the Michigan House of Representatives and Senate, passed by the Legislature and signed into law by the Governor, would go into effect for the next

Primary Election, scheduled for August 7, 2012, and the next General Election scheduled for November 6, 2012.

20. In the Redistricting Plan, the State stripped minority voters of their right to select candidates of their choosing by creating districts that will force-out 50% of the minority Representatives to the State House from the City of Detroit (35% of all minority State Representatives in total, statewide) in the August 7, 2012 Primary Election, compared to 2.083% (2 out of a total of 96) of white candidates forced-out state-wide.   The Black Caucus presented alternative maps with no incumbent pairings to protect voter rights. The State ignored these maps.   The State's action violates Section 2 of the 1965 Voting Rights Act (42 U.S.C. Sec. 1973), the Fourteenth Amendment's Equal Protection Clause, and the Fourteenth Amendment's One Person One Vote Standard.  *Cox v. Larios*, 542 U.S. 947 (2004).


21. Furthermore, in the Redistricting Plan, the State has deprived Latino voters in Southwest Detroit of the ability to act in a politically cohesive manner by willfully and knowingly creating House of Representatives districts in the community that split the Latino community in half, just as Latino voters have become the fastest-growing demographic in the City of Detroit and the State of Michigan over the past 10 years. The State rejected a map which keeps the Latino community whole with a 42.74% Hispanic Voting Age Population base, and instead "cracked" the community, by placing 24.5% of Latino voters in one district and 17.3% of Latino voters in another, frustrating this community's ability to speak with a politically cohesive voice in Lansing.  The State intentionally divided the rapidly-growing Latino community in Southwest Detroit in half, to diminish

and weaken the political strength of Latino voters speak with a politically cohesive voice in Lansing. The State's action, in this respect, violates Section 2 of the 1965 Voting Rights Act, *supra*, as well as the Fourteenth Amendment's Equal Protection Clause. *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).

22. Unless enjoined by this Court, Defendants will conduct the elections pursuant to the existing Redistricting Plan for the Michigan House of Representatives and Senate.

23. African-American voters in the City of Detroit and throughout the State of Michigan, have the right to elect candidates of their choosing.

24. The State's Redistricting Plan strips African-American voters of their right to elect candidates of their choosing by forcing out 35% of the African-American Representatives to the Michigan House of Representatives, in total and 50% within the City of Detroit, through racially gerrymandered incumbent pairings.

25. House Districts for the City of Detroit can be drawn to avoid incumbent pairings. The Black Caucus presented the Redistricting Leadership with such a map that was ignored.

26. Historically, African-American residents of the City of Detroit and State of Michigan have been subject to private as well as official discrimination on the basis of race, including discrimination in attempting to exercise their right of franchise and to participate equally with other residents in the political process.

27. Latino-American voters have the right to participate fully in the electoral and political processes at all levels of government.

28. Latino-Americans, over the past 10 years, are the fastest-growing demographic group in the City of Detroit and the State of Michigan. A single-member House District can be drawn with a base Hispanic Voting Age Population ("HVAP") of 42.7% in Southwest

Detroit, which is the area of the State with the greatest concentration of the Latino population. But instead of maintaining the Latino population intact, the State Map splits this population among two adjacent House Districts, one with 24.53% HVAP (District 5) and 17.26% HVAP (District 6).

29. A single member House Districts for Southwest Detroit can be drawn to avoid splitting the Latino community. The Black Caucus presented the Redistricting Leadership with such a map that was ignored.

30. Latino-Americans in Southwest Detroit are politically cohesive.

31. Latino-Americans in Southwest Detroit have organized themselves collectively for political activity.

32. Latino-Americans in Southwest Detroit have common and distinct history, culture, and language.

33. Historically, Latino-American residents of the City of Detroit and State of Michigan have been subject to private as well as official discrimination on the basis of race, including discrimination in attempting to exercise their right of franchise and to participate equally with other residents in the political process.

34. Voting in Michigan is racially polarized.

35. The policy underlying the adopted Redistricting Plan is illogical and illegal.

36. The purpose and effect of the State Redistricting Plan for the State of Michigan is to prevent African-American voters in the City of Detroit from exercising their right to elect candidates of their choosing because of discriminatory incumbent pairings, and to frustrate the Latino community in Southwest Detroit's ability to participate cohesively in the political process because the community has been split in half.

37. The Defendants' actions complained of herein are under color of law of the State of Michigan.

## V.

### First Cause of Action

**(42 U.S.C. Sec. 1983; 42 U.S.C. Sec. 1973; Equal Protection, One Person One Vote, U.S. Constitution Amend. XIV)**

38. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

39. This Court could and should grant an injunction and/or issue a declaratory judgment that the existing State Redistricting Plan has the purpose and result of denying or abridging the right of African-Americans to vote for candidates of their choosing, because of discriminatory incumbent pairings, in violation of Plaintiffs rights guaranteed by Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause and One Person One Vote Standard of the Fourteenth Amendment. Cox v. *Larios*, 542 U.S. 947 (2004).

## VI.

### Second Cause of Action

**(42 U.S.C. Sec. 1983; 42 U.S.C. Sec. 1973; Equal Protection, Under U.S. Constitution Amend. XIV)**

40. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

41. This Court could and should grant an injunction and/or issue a declaratory judgment that the existing State Redistricting Plan has the purpose and result of denying or abridging the right of Latino-American voters in Southwest Detroit to effectively participate in the

political process with a politically cohesive voice in light of the community having been cracked in half, in violation of Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause of the Fourteenth Amendment. *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).

## VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as stated below:

1. Injunctive relief to ensure compliance with the United States Constitution;

2. Issue a judgment declaring that the existing State Redistricting Plan has the purpose and result of denying or abridging the right of African-Americans to vote for candidates of their choosing, because of discriminatory incumbent pairings, in violation of Plaintiffs rights guaranteed by Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause and One Person One Vote Standard of the Fourteenth Amendment. Cox v. *Larios*, 542 U.S. 947 (2004).

3. Issue a judgment declaring that the existing State Redistricting Plan has the purpose and result of denying or abridging the right of Latino-American voters in Southwest Detroit to effectively participate in the political process with a politically cohesive voice in light of the community having been cracked in half, in violation of Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, as well as the Equal Protection Clause of the Fourteenth Amendment. *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).

4. For costs of suit and attorney's fees; and

5.  For such other and further relief as the court may deem just, proper, and appropriate.

Respectfully submitted,

/s/MELVIN BUTCH HOLLOWELL
MELVIN BUTCH HOLLOWELL (P-37834)
Detroit Branch NAACP
8220 Second Avenue
Detroit, Michigan 48221
313-871-2087
butchhollowell@gmail.com

JAMES P. ALLEN (P-52885)
HARRY KALOGERAKOS (P-53544)
KELLY L. CUMBERWORTH (P-70872)
Allen Brothers, PLLC
400 Monroe, Suite 220
Detroit, Michigan 48226
313-962-7777
jamesallen@allenbrotherspllc.com

LAWRENCE GARCIA (P-54890)
Garcia Law Group, PLLC
3011 W. Grand Blvd.
Fisher Building
Detroit, Michigan 48202
877-643-6255
lgarcia@garcialawgrouppllc.com

ALAN L. CANADY (P-35052)
Attorney at Law
P.O. Box 309
Lansing, Michigan 48826
517-256-9117
alcanadyconsulting@gmail.com

ATTORNEYS FOR PLAINTIFFS

DATED: December 8, 2011

15