UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, DETROIT BRANCH, FRED
DURHAL, Jr., in his Official Capacity as MICHIGAN
LEGISLATIVE BLACK CAUCUS CHAIR, THE INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA
(UAW), LATINO-AMERICANS FOR SOCIAL AND
ECONOMIC DEVELOPMENT (LA SED), ANTHONY
BENEVIDES, RAQUEL CASTANEDA LOPEZ, ANGELITA
ESPINO, SHERRY G.DAGNOGO, KENNETH WHITTAKER,
CHRISTOPHER WILLIAMS,

       Plaintiffs,

v.                                          Civil Action No.

RICK SNYDER, in his Official Capacity as Governor
of the State of Michigan, RUTH JOHNSON, in her Official
Capacity as Secretary of State for the State of Michigan,

       Defendants.
_____/

## PLAINTIFFS MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTIVE AND DECLARATORY RELIEF AND APPOINTMENT OF SPECIAL MASTER

       Pursuant to Rule 65 of the Federal Rules of Civil Procedure, and for the reasons set forth in the Memorandum submitted with this Motion, Plaintiffs hereby respectfully move this Court to grant this Motion for Temporary Restraining Order, Preliminary Injunction, Declaratory Judgment and Appointment of a Special Master to advise the Court in revising the State of Michigan's Redistricting Plan for Michigan House of Representatives Districts in the City of Detroit.

Pursuant to L.R. 7.1(a)(1), Eastern District of Michigan, Plaintiffs have sought the concurrence of Defendants to file the instant Motion and Brief.  Defendants do not concur in the instant Motion.

Specifically, Plaintiffs respectfully request that this Court enter an Order:

(1) Enjoining Defendants from implementing the Redistricting Plan and/or proceeding with plans for holding any further elections for the Michigan House of Representatives in violation of Plaintiffs' rights under Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, and under the Equal Protection Clause and the One Person One Vote Standard of the Fourteenth Amendment, until a final ruling of this Court on Plaintiffs' claims in the instant action.


(2) Requiring Defendants to submit a revised Redistricting Plan for Michigan House of Representatives Districts, which complies with Section 2 of the 1965 Voting Rights Act, 42 U.S.C. Sec. 1973, and under the Equal Protection Clause of the Fourteenth Amendment, and the Fourteenth Amendment's One Person One Vote Standard; or in the alternative, substituting the Michigan Legislative Black Caucus' Plan for the Michigan House of Representatives for the State's Plan, submitted to the Michigan House of Representatives during the Redistricting Process.

(3) Issuing a Declaratory Judgment, pursuant to 28 U.S.C. Sec's 2201, 2202, that the State's Redistricting Plan does not comply with the 1965 Voting Rights Act and the Fourteenth Amendment.

(4) Appointing a Special Master to advise the Court in revising the State's Redistricting Plan for Michigan House of Representatives Districts.

2

Respectfully submitted,


/s/Melvin Butch Hollowell
MELVIN BUTCH HOLLOWELL (P-37834)
Detroit Branch NAACP
8220 Second Avenue
Detroit, Michigan 48221
313-871-2087
butchhollowell@gmail.com

JAMES P. ALLEN (P-52885)
HARRY KALOGERAKOS (P-53544)
KELLY L. CUMBERWORTH (P-70872)
Allen Brothers, PLLC
400 Monroe, Suite 220
Detroit, Michigan 48226
313-962-7777
jamesallen@allenbrotherspllc.com

LAWRENCE GARCIA (P-54890)
Garcia Law Group, PLLC
3011 W. Grand Blvd.
Fisher Building
Detroit, Michigan 48202
877-643-6255
lgarcia@garcialawgrouppllc.com

ALAN L. CANADY (P-35052)
Attorney at Law
P.O. Box 309
Lansing, Michigan 48826
517-256-9117
alcanadyconsulting@gmail.com

ATTORNEYS FOR PLAINTIFFS



DATED: December 8, 2011

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, DETROIT BRANCH, FRED
DURHAL, Jr., in his Official Capacity as MICHIGAN
LEGISLATIVE BLACK CAUCUS CHAIR, THE INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA
(UAW), LATINO-AMERICANS FOR SOCIAL AND
ECONOMIC DEVELOPMENT (LA SED), ANTHONY
BENEVIDES, RAQUEL CASTANEDA LOPEZ, ANGELITA
ESPINO, SHERRY G.DAGNOGO, KENNETH WHITTAKER,
CHRISTOPHER WILLIAMS,

        Plaintiffs,

v.                                        Civil Action No.

RICK SNYDER, in his Official Capacity as Governor
of the State of Michigan, RUTH JOHNSON, in her Official
Capacity as Secretary of State for the State of Michigan,

        Defendants.
_____/

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION,
AND APPOINTMENT OF SPECIAL MASTER

**I.**

**STATEMENT OF THE CASE**

On August 9, 2011, Michigan Governor Rick Snyder signed into law SB 498 (the

Redistricting Plan for the State Legislature), and HB 4780 (the Redistricting "Apportionment"

Plan for Michigan's Congressional Delegation).  The subject matter of this lawsuit is SB 498,

1

"An act to divide this state into 110 representative and 38 senatorial districts [f]or terms of office beginning on or after January 1, 2013", and the illegal manner in which it drew district lines for the Michigan House of Representatives, within the City of Detroit.

In the Redistricting Plan, the State stripped minority voters of their right to select candidates of their choosing by creating districts that will force-out 50% of the minority Representatives to the State House from the City of Detroit (35% of all minority State Representatives in total, statewide) in the August 7, 2012 Primary Election, compared to 2.083% (2 out of a total of 96) of white candidates forced-out state-wide.   The Black Caucus presented alternative maps with no incumbent pairings to protect voter rights.  The State ignored these maps.   The State's action violates Section 2 of the 1965 Voting Rights Act (42 U.S.C. Sec. 1973), the Fourteenth Amendment's Equal Protection Clause, and the Fourteenth Amendment's One Person One Vote Standard.  *Cox v. Larios*, 542 U.S. 947 (2004).


Furthermore, in the Redistricting Plan, the State has deprived Latino voters in Southwest Detroit of the ability to act in a politically cohesive manner by willfully and knowingly creating House of Representatives districts in the community that split the Latino community in half, just as Latino voters have become the fastest-growing demographic in the City of Detroit and the State of Michigan over the past 10 years. The State rejected a map which keeps the Latino community whole with a 42.74% Hispanic Voting Age Population base, and instead "cracked" the community, by placing 24.5% of Latino voters in one district and 17.3% of Latino voters in another, frustrating this community's ability to speak with a politically cohesive voice in Lansing.  This is the third time in the last three Redistricting cycles that the State Redistricting

leadership has attempted to split the Latino electorate in this fashion. The State intentionally divided the rapidly-growing Latino community in Southwest Detroit in half, to diminish and weaken the political strength of Latino voters speak with a politically cohesive voice in Lansing. The State's action, in this respect, violates Section 2 of the 1965 Voting Rights Act, *supra*, as well as the Fourteenth Amendment's Equal Protection Clause. *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).

In light of these violations of law, Plaintiffs seek relief in the manner of a Temporary Restraining Order, Preliminary Injunction, and the Appointment of a Special Master to cure the discriminatory conduct of the State of Michigan, in its Redistricting Plan for Michigan House of Representatives Districts in the City of Detroit ("the State Map").

## II.

## STATEMENT OF FACTS

### A.

### THE MICHIGAN REDISTRICTING PROCESS

### 1.

### The State is Required to Adhere to a Heightened Standard for Civil Rights Compliance in Drawing Redistricting Maps

The Redistricting Process in Michigan is controlled by the State Legislature (MCL Sec. 4.261 [State Legislature], MCL 3.62 [Congressional Reapportionment]), and takes place every

ten (10) years pursuant to population data from the Decennial U.S. Census, as required by Article

1, Sec. 2 of the U.S. Constitution.  Michigan's Redistricting Statute is fairly unique in the

country in that it is one of only a handful of states which specifically references and requires the

application of the 1965 Voting Rights Act and the Equal Protection Clauses of the Fourteenth

Amendment to the U.S. Constitution, and the Michigan Constitution, to Congressional

Redistricting (See, MCL Sections 4.261(l), 3.54(c) and (d)).  The statute provides as follows:

> (c) The redistricting plan was designed to comply fully with both section 2 of the voting rights act of 1965, Public Law 89-110, 42 U.S.C. 1973, and the requirements of the equal protection clause of amendment XIV of the constitution of the United States, as set forth in Shaw v Reno, 509 US 630 (1993), and subsequent cases concerning racial gerrymandering. In light of these dual obligations, the plan avoids any practice or district lines that result in the denial of any racial or ethnic group's equal opportunity to elect a representative of its choice and, at the same time, does not subordinate traditional redistricting principles for the purpose of accomplishing a racial gerrymander or creating a majority-minority district. As a consequence, the plan does not result in retrogression or dilution of minority voting strength, particularly in light of the demographic limitations caused by relative population losses and the neutral criteria set forth in section 3 of the congressional redistricting act, 1999 PA 221, MCL 3.63. However, the plan does not sacrifice traditional neutral principles, such as, most importantly, preservation of county and municipal boundaries, for the purpose of engaging in a gerrymander that unnecessarily favors 1 racial group over others.
>
> (d) The plan furthers the underlying purpose of the state constitution of 1963 by facilitating effective representation in the legislature where elected representatives can advance the shared interests of unified municipalities or counties. It does so without sacrificing voting rights act of 1965 principles, equal electoral opportunities, or racial fairness.
>
> *Id* (emphasis added).

Redistricting for the State Legislative process is set forth in MCL 4.261(l), where it states that

"Senate and house districts shall not violate the precedents established in *Miller v Johnson*, 115 S

Ct 2475; 132 L Ed 2d 762 (1995); *Bush v Vera*, 116 S Ct 1941; 135 L Ed 2d 248 (1996); and,

*Shaw v Hunt*, 116 S Ct 1894; 135 L Ed 2d 207 (1996)." These cases, *Miller v. Johnson, supra*, *Bush v. Vera, supra*, and *Shaw v. Hunt, supra*, stand for the proposition that states must adhere to the principles of the 1965 Voting Rights Act in the Redistricting process.

This civil rights focus – embedded in Michigan's Redistricting law - significantly raises the bar for compliance with Federal fair and equal treatment standards in the Redistricting process. And of course, Michigan's statutory redistricting principles are always subordinate to Federal authority, such as the Fourteenth Amendment's Equal Protection Clause and the Voting Rights Act, pursuant to the Constitution's Supremacy Clause. U.S. Const., Art. VI, Clause 2; *Baker v. Carr*, 369 U.S. 186 (1962); *Davis v. Bandamer*, 478 U.S. 109 (1986).

**2.**

**2010 U.S. Census Data Indicates Significant Gains in Michigan's Minority Population**

The Legislature receives Census data and draws districts for Congress and the State Legislature, in a manner that will define the allocation of political power in Michigan for the next decade.  According to the 2010 Census, Michigan was the only state to have lost population. (U.S. Census Bureau, 2010 Census).  The state's total population declined from 9,938,444 (2000) to 9,883,640 (2010).  On the other hand, just as America is becoming a more diverse nation, Michigan is becoming a more diverse state.   Michigan's minority population increased significantly over the past ten (10) years, from 21.4% (2000) to 23.4% (2010), even with the decrease in the City of Detroit's population from 951,270 (2000) to 713,777 (2010). Furthermore, Detroit is still, by far, Michigan's largest city (number two, Grand Rapids: 188,040, number three, Warren: 134,056).

These gains in diversity look different than they did in the past. More people of color now live in the suburbs. No longer is there just a concentration in our city centers. Voters of color moved across the street and across the state. For example, between 2000 and 2010 there was a 389% increase in the number of African Americans living in Warren, a 496% increase in Eastpointe, and a 108% increase in Melvindale. Western Michigan saw similar gains. In Grand Rapids the Hispanic population increased by 13.3%. In Wyoming the Hispanic population increased 109% and the African-American population increased by 48.4%. The same is true in Kentwood, which saw a 135% increase in its Hispanic population, and an 80% increase in the number of African-American residents.

In Detroit, while the total population declined, *percentage* of the African-American population *grew* from 81.6% to 82.7%, and the Hispanic population *grew* by a full two percentage points (6.8% from 5.0%).

### 3.

### The Michigan Legislative Black Caucus' Participation in Redistricting Process

The Michigan Legislative Black Caucus ("MLBC" or "Black Caucus") represents twenty-one Members of the Michigan State Legislature in both the House and the Senate. From the beginning of the Redistricting Process the Black Caucus was heavily engaged in advocating for district maps that must comply with Civil Rights requirements. Black Caucus Members Rep. Woodrow Stanley and Rep. Davis Nathan sat on the House Redistricting Committee, while Senators Bert Johnson and Virgil Smith sat on the Senate Redistricting Committee. The Black Caucus engaged legal counsel and hired one of the State's leading experts for drawing maps.

6

Upon the March 22, 2011 release of 2010 U.S. Census data for the State of Michigan, the

Black Caucus held a press conference at the State Capitol in Lansing, where it issued a statement

that:

> "The ultimate goal will be to compel House and Senate Republicans [in
> charge of the redistricting process], and specifically those serving on the
> legislative Redistricting Committees, to hold hearings, include the public
> for input and comment, explain the process, and create districts maps
> which respect the integrity of voters and principles of access to the ballot.
> Additionally, they should understand not just the value, but the ultimate
> importance of making sure that every person that deserves representation,
> in fact, receives it."

> (MLBC Press Rel., 3/24/11, emphasis added).

On April 26 the Black Caucus, through Caucus Chair Fred Durhal and through its Legal

Counsel, presented Testimony to the House Redistricting Committee (which held its first

meeting on February 22, 2011).   The Black Caucus' testimony before the Committee, put the

Committee on notice as to the legal requirements under the Voting Rights Act:

> "Section 2 of the Act is at the core of protecting minority voting rights in
> the redistricting process.  In essence Section 2 provides that minority
> voting strength is not to be diluted in the drawing of district boundaries in
> the redistricting process. Based on the totality of circumstances, if it can
> be shown that district lines were drawn to limit the chances of minorities
> to elect candidates of their choosing, that would constitute a violation of
> Section 2.  Amendments to Section 2 of the Act, adopted in 1982, provide
> that district lines that are drawn with either a racially discriminatory intent
> or effect will be struck down by the courts. (42 USC Section 1973(a)(2000
> ed.).

> As a general rule, minority vote dilution occurs when African-Americans
> are put in a district where the majority votes as a bloc to cancel out or
> minimize the effectiveness of minority voters."

(Testimony of Melvin Butch Hollowell, Legal Counsel, Michigan
Legislative Black Caucus, Michigan House of Rep's, Redistricting
Comm., 4/26/11).

Similar testimony was presented to the Michigan State Senate Redistricting Committee
by Black Caucus Chair Durhal and Legal Counsel, on May 11, 2011. The Black Caucus,
through its Chair, Legal Counsel, and/or 4 Members serving on the House and Senate
Redistricting Committees, testified, raised questions and comments, or filled out "Hearing
Testimony Cards" regarding compliance requirements at each legislative Redistricting hearing of
the House and Senate.

The Black Caucus held its own Redistricting Hearings across the State to educate the
public on the process and to receive public input and comment. The four (4) formal hearings
took place on:

- May 16th, 2011, Bethel United Methodist Church (1309 North Ballenger, Flint,
  Michigan, for the Flint and Saginaw areas) 6:00pm

- May 23rd, 2011, Liberty Temple Baptist Church (17188 Greenfield, Detroit, Michigan,
  for the Detroit and Southfield areas) 6:00pm

- May 25th, 2011, Boys and Girls Club Gym (3910 Livernois, Detroit, Michigan, for the
  Southwest Detroit area) 6:00pm

- June 7th, 2011, New Life COGIC (1072 Jefferson, Grand Rapids, Michigan, for Western
  Michigan) 6:00pm

The MLBC prepared, distributed and compiled "Audience Questionnaires" for the hearings,
which solicited views from 481 attendees on a range of issues relating to full and meaningful
participation in the political process. The Questionnaires asked: "(1) Please rank the issues that
concern you the most (a) unemployment/jobs, (b) Education, (c) Crime, (d) Health Care, (e)

8

Immigration Rights, (f) Housing, (g) Cost of Car/Home Insurance, (h) Transportation, (i) Lower

Taxes, (j) Abortion, and (k) Other; (2) Are elected officials responsive to the concerns of your

community?; (3) Do the elected officials representing your community reflect the diversity of

your community?; (4) Should your community continue to have representatives in Lansing and

Washington, D.C. who share your background and life experiences?; (5) Have you, members of

your family, or close friends, had an experience with racial discrimination in your community,

and if so, can you please describe it?, (6) Have any election campaigns in your area been

characterized by racial appeals?; (7) Which political party do you generally identify with more?;

(8) If Lansing tries to break up your network of community-based organizations and

neighborhood associations, should that be opposed, in court if necessary?; (9) Please identify

your race [o]r national origin; (10) Please identify your religion or faith tradition."

The findings from the Questionnaires and testimony from the public overwhelmingly

stood for the proposition that the electorate advocates for its rights to be protected in the

Redistricting process.

In addition to the formal hearing processes conducted by the House and Senate

Redistricting Committees and the Black Caucus, Black Caucus representatives met informally

with the Republican and Democratic Leadership of the House and Senate Committees.  At these

informal meetings, the Black Caucus presented the Redistricting Leadership with proposed maps

for Districts with significant minority populations: Detroit, Southfield, Flint, Saginaw, Ypsilanti,

Pontiac, and Grand Rapids.

The Black Caucus' maps for the House of Representatives, within the City of Detroit, had

the same number of Districts as the State's maps, however, in the Black Caucus' maps (1) there

were no incumbent Primary Election pairings, (2) the Latino community in Southwest Detroit

9

was kept whole, (3) majority-minority (over 50%) districts were outlined for Grand Rapids and Pontiac, and (4) the Black Caucus' maps scored higher than the State's maps on the objective "Apol" standards for compactness, adjacency, contiguity and respect for traditional municipal boundaries. (MCL 4.261; See, Dan Fox Affidavit).

### 4.

### The Legislature Approved the Redistricting Plan Over the Objections of the Michigan Legislative Black Caucus

Nevertheless, the House and Senate released maps on June 17 which rejected the Black Caucus' map recommendations. On June 21, the Black Caucus issued a Press Release which, in a statement, called the House and Senate plans "Unacceptable" and "Inconsistent with the Federal Voting Rights Act." (MLBC Press Rel., 6/21/11). The State's maps are unacceptable and inconsistent with the Voting Rights Act in two respects: first, the maps strip minority voters of candidates of their choosing by forcing out a disproportionate number of minority incumbent pairings as compared to White incumbency pairings; and second, because the maps split the Latino community in Southwest Detroit in half to frustrate their political cohesion just as the Latino community has become the fastest-growing demographic in the City of Detroit and the State of Michigan.

### (a)

### The State Maps Stripped Minority Voters of the Candidates

10

**of their Choosing through Primary Incumbent Pairings in
Significant Disproportion to White Incumbent Pairings**

Under the State Map, voters of color have been stripped of their ability to select

candidates of their choosing at an exponentially higher rate that white voters.  The State Map

forces out five (5) of the fourteen minority representatives (35%) (the minority force-out

percentage in the City of Detroit is 50%) in the House of Representatives, by gerrymandering

districts that requires these Representatives to run against one another in the August 7, 2012

Primary election, compared to only 2 out of 96 (2.083%) White candidates forced out by

incumbent pairings, both of which are in Macomb County: one of the two candidates in House

District 28, Rep. Switalski v. Rep. Liss (80.31% White Voting Age Population "WVAP"), and

one of the two candidates in House District 33, Rep. Goike v. Rep. LaFontaine (91.6% WVAP).


In addition to this gross disparity in how the minority candidates were treated when

compared to White candidates, the fact is there was no need, whatsoever, for the State to have

forced almost the entirety of Detroit's minority political power structure at the State Capitol to

run against one another.  The Michigan Legislative Black Caucus presented the State

Redistricting Committees with an alternative map - with the same number of Districts - for the

City (10), but which had *no* incumbency pairings, and which scored *higher* than the state's map

on the objective standards, known as "Apol" requirements, such as contiguity, compactness,

adjacency and the respecting of traditional political and municipal boundaries. (MCL 4.261; See,

Dan Fox Affidavit).

Set forth below is a chart comparing the State Plan for 2001 to the recently-passed 2011 State Plan.  The chart comparisons demonstrate that 10 years ago, even though there was a significant population loss in Detroit, as reflected in the Census, there were no incumbency pairings and Southwest Detroit remained intact.

### 2001 Plan

| HD | | Population | Ideal Pop | Deviation | VAP | Black | | Hispanic | |
|----|----|----|----|----|----|----|----|----|----|
| 1 | Bledsoe | 88,517 | 90,349 | -2.03% | 64,693 | 11,856 | 18.33% | 763 | 1.18% |
| 2 | Howze | 88,565 | 90,349 | -1.97% | 53,880 | 44,624 | 82.82% | 384 | 0.71% |
| 3 | Talabi | 88,536 | 90,349 | -2.01% | 57,567 | 52,071 | 90.45% | 378 | 0.66% |
| 4 | Stapleton | 88,400 | 90,349 | -2.16% | 66,114 | 57,044 | 86.28% | 600 | 0.91% |
| 5 | Olumba | 88,386 | 90,349 | -2.17% | 61,770 | 39,713 | 64.29% | 566 | 0.92% |
| 6 | Durhal | 88,567 | 90,349 | -1.97% | 64,293 | 56,084 | 87.23% | 824 | 1.28% |
| 7 | Womack | 88,555 | 90,349 | -1.99% | 62,177 | 55,472 | 89.22% | 475 | 0.76% |
| 8 | Stallworth | 88,514 | 90,349 | -2.03% | 64,304 | 61,911 | 96.28% | 369 | 0.57% |
| 9 | Jackson | 88,537 | 90,349 | -2.01% | 61,245 | 51,666 | 84.36% | 524 | 0.86% |
| 10 | Santana | 88,543 | 90,349 | -2.00% | 58,968 | 38,491 | 65.27% | 1,617 | 2.74% |
| 11 | Nathan | 88,557 | 90,349 | -1.98% | 60,539 | 52,166 | 86.17% | 508 | 0.84% |
| 12 | Talib | 88,478 | 90,349 | -2.07% | 60,716 | 15,587 | 25.67% | 24,170 | 39.81% |

### 2011 Plan

| HD | | Population | Ideal Pop | Deviation | VAP | Black | | Hispanic | |
|----|----|----|----|----|----|----|----|----|----|
| 1 | open | 87,768 | 89,851 | -2.32% | 62,294 | 37,804 | 60.69% | 670 | 1.08% |
| 2 | Bledsoe/Talabi | 87,595 | 89,851 | -2.51% | 64,027 | 41,558 | 64.91% | 644 | 1.01% |
| 3 | Howze/Olumba/Womack | 87,906 | 89,851 | -2.16% | 63,943 | 57,796 | 90.39% | 666 | 1.04% |
| 4 | open | 88,168 | 89,851 | -1.87% | 66,021 | 40,726 | 61.69% | 933 | 1.41% |
| 5 | Durhal | 87,356 | 89,851 | -2.78% | 61,356 | 38,128 | 62.14% | 15048 | 24.53% |
| 6 | Tlaib/Stapleton | 89,085 | 89,851 | -0.85% | 68,287 | 41,240 | 60.39% | 11789 | 17.26% |
| 7 | open | 88,586 | 89,851 | -1.41% | 66,954 | 63,922 | 95.47% | 508 | 0.76% |
| 8 | Nathan | 87,850 | 89,851 | -2.23% | 64,510 | 58,671 | 90.95% | 548 | 0.85% |
| 9 | Santana | 89,598 | 89,851 | -0.28% | 62,867 | 47,782 | 76.00% | 1599 | 2.54% |
| 10 | Stallworth/Cavanagh | 87,869 | 89,851 | -2.21% | 66,763 | 37,626 | 56.36% | 1085 | 1.635 |

In six (6) meetings with the Chair of the House Redistricting Committee, the Michigan Legislative Black Caucus presented alternative maps, with the same number of districts, with no incumbency pairings.  The Black Caucus' concerns about the need to comply with the Voting

12

Rights Act, throughout the Redistricting Process, were put in writing and addressed to the Chairs

of the House and Senate Redistricting Committees, the Speaker of the House, the Senate

Majority Leader, and the Governor ("Redistricting Leadership").  The correspondence the Black

Caucus received from the Redistricting Leadership, not including the Governor, was that the

Caucus should work with House Redistricting Chair, Rep. Pete Lund, as the designated, central

contact person for addressing the Black Caucus' concerns, on behalf of Redistricting Leadership,

throughout the Redistricting Process. The response to the Black Caucus' letter to the Governor

was that former Lieutenant Governor Dick Posthumus would be available to meet on the

Governor's behalf.  In the end, the Black Caucus' maps were ignored and these disproportionate

incumbent pairings in Detroit were engineered to create maximum upheaval in the city's politics,

and to divert the Black political establishment's time, resources and energy from issues like the

de-funding of K-12 education, public school overcrowding, the Emergency Financial Manager

law, and fully engaging in the 2012 Presidential re-election campaign.


**(b)**

**The State Maps Cracked the Latino Community in Southwest Detroit**


Just as the Latino community became the fastest-growing demographic in the City and

the State over the past 10 years, the State Map deliberately divides this community in half

("cracking"), frustrating the Latino community's ability to speak with a singular political voice.

For its dividing line, the State Map uses the Railroad Tracks beginning, on the Northern border

of the district, at I-94 and Grand River, proceeding South and bisecting  Livernois, Central,

Vernor, Springwells, and I-75 - *the very heart of Detroit's Latino community* -  before it leaves

13

Detroit, crosses into River Rouge and heads West, at the Southern end of the State Map.  In fact, the historic boundaries of Southwest Detroit, virtually synonymous with the Latino neighborhoods in this cohesive community, are recognized by demographers as: Warren Avenue to the North, 6th Street to the East, the Detroit River to the South, and the Dearborn border to the West (See, SEMCOG Sub-community Profile, 2010 Census).     According to the Southeast Michigan Council of Government's ("SEMCOG") 2010 Census analysis for Detroit neighborhoods, Southwest Detroit is a growing area of distinctive cultural, economic and political importance, with four majority and one near-majority Hispanic neighborhoods of long-standing: Chadsey, Hubbard-Richard, Springwells, and Vernor/Junction, and West Riverfront, which combine for a 47% total Hispanic population.

The State did not have to divide the Latino community, but it chose to do so anyway.

The Black Caucus presented the Chair of the House Redistricting Committee with a map ((Black Caucus District Number 5) that kept Southwest Detroit whole, with a 42.7% Hispanic Voting Age Population ("HVAP") base, and a Black Voting Age Population ("BVAP") of 29.5%, with boundaries that respect the historical boundaries of Southwest Detroit, and which are similar to the legislative boundaries in place for the past 3 decades.  The State ignored the Black Caucus' maps and chose to divide the Latino community into two separate districts: a new House District 5, to the West of the Railroad Tracks, with a 24.5% HVAP, and to the East of the Railroad Tracks, a new House District 6, with a 17.3% HVAP.

14

*This is the third time in the last three legislative Redistricting cycles that the Republican-controlled Legislature has attempted to crack the Latino community in Southwest Detroit.* So the State's Map, in drawing this dividing line, was done willfully and knowingly.

During the debate on the legislative Redistricting Plan in 2001 (House Bill 4965), Representatives Belda Garza from Southwest Detroit and Minority Floor Leader, Representative Buzz Thomas, offered amendments on the House Floor opposing the proposed division of the Latino community in Southwest Detroit and advocated for keeping the Latino community whole. (See, Affidavit of Belda Garza).

The Legislature adopted Rep. Garza and Thomas' amendment to House Bill 4965 keeping the Latino community in Detroit intact by a unanimous vote of 108 to 0. (91st Legislature, Reg. Sess., Journal of the House of Representatives No. 55, p. 1044). The bill as amended went on to be concurred in by the Senate and eventually signed into law by the Governor.

A decade before that, during the 1992 legislative Redistricting Process, the State once again considered splitting the Latino electorate in Southwest Detroit. The State Maps were challenged in federal and state court. *NAACP v. Austin*, 857 F. Supp. 560 (E.D. Mich. 1994); *In re: Apportionment*, 439 Mich. 715 (1992). In the *NAACP v. Austin* litigation, the federal district court, in referring to the Michigan Supreme Court and its Special Master, found that:

> "Also, the masters and the Michigan Supreme Court specifically stated that *'fracturing' of the Hispanic population [in Southwest Detroit] was a concern in formulating the apportionment plan.*"
>
> *NAACP v. Austin*, 857 F. Supp, supra at 574-575.

15

The Supreme Court referred to the importance of keeping the Southwest Detroit's Latino community intact, and at trial, there was expert witness testimony by the Republican Party to the effect that it had initially proposed a split of the Latino community but ultimately declined to do so as it became clear the maps would be litigated, and used this as a defense to the claim that its maps were discriminatory.

Republicans in control of the Legislature's last three Redistricting Plans, have engaged in a single-minded effort to divide Southwest Detroit's Latino population. The division in this year's State Map affords Latino voters less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

The State intentionally divided the rapidly-growing Latino community in Southwest Detroit in half, to diminish and weaken the political strength of Latino voters as a cohesive voice to weigh in on vital political issues in Lansing.

## (c)

**The Maps Were Approved Despite Legal Deficiency and Black Caucus Objections**

The Redistricting Bills were approved by the House of Representatives on June 22, and by the Senate on June 29. The Redistricting Bills were presented to Governor Snyder on July 26, and he signed then into law on August 9, 2011.

## III.

## THE STATE'S TARGETING OF MINORITY VOTERS'

**CANDIDATES OF CHOICE, FOR INCUMBENCY
PAIRINGS IN THE PRIMARY ELECTION VIOLATES THE
FOURTEENTH AMENDMENT AND SECTION 2 OF THE
1965 VOTING RIGHTS ACT**

The targeting of African American legislators for incumbency pairings in significant

disproportion to incumbent pairings for White legislators, diminishes minority voters' selections

for electing candidates of their choosing, and therefore violates the Equal Protection Clause and

the One Person One Vote standard of the Fourteenth Amendment, as well as Section 2 of the

Voting Rights Act. *Cox v. Larios*, 542 U.S. 947 (2004).

It is axiomatic that the Equal Protection Clause of the Fourteenth Amendment stands for

the principle that "[n]o person shall be denied the equal protection of the laws." *Romer v. Evans*,

517 U.S. 620, 621 (1996). The 1965 Voting Rights Act was passed by Congress and signed into

law by President Lyndon B. Johnson just weeks after the attacks on men women and children, as

they crossed Selma, Alabama's Edmund Pettis Bridge, in March of 1965, to peacefully protest

laws aimed at disenfranchising African American voters.  This law, a cornerstone of the

American civil rights movement, is credited with giving millions access to the ballot and full

participation in the democratic process.  In 2006 the Act was re-authorized for 25 years (until

2031) by Congress.

Section 2 of the Act is at the core of protecting minority voting rights in the redistricting

process.  In essence, Section 2 provides that minority voting strength is not to be diluted in the

drawing of district boundaries. Based on the totality of circumstances, a Section 2 violation

arises if it can be shown that district lines were drawn to limit the chances of minorities to elect

candidates of their choosing.  The 1982 Amendments to Section 2 provide that the courts are to

17

strike down district lines that are drawn with either a racially discriminatory intent or effect.  (42

U.S.C. Section 1973(a)(2000 ed.)); *Shaw v. Reno*, 509 U.S. 630 (1993).


In *Cox v. Larios, supra,* the Supreme Court addressed the question posed in the instant

matter here in Michigan in this year's Redistricting Process: whether forced primaries or

incumbent pairings can rise to the level of a violation under the Fourteenth Amendment and

Section 2 of the Voting Rights Act.  The answer is "yes."  The Court determined that when a

State, such as Michigan, disproportionately targets minority legislators (who are the candidates

of choosing for the minority electorate), such disproportionate targeting is illegal.

*Larios v. Cox* arose out of the 2002 Redistricting Plan for the State House and Senate in

the State of Georgia, following the 2000 Decennial Census. Democratic Party legislators had a

majority in both chambers and were in control of the Redistricting Process, just as the Michigan

Republican Party is in control of our state's Redistricting Process.  At the federal district court

level, a three-judge panel of the Court first looked into deviations from "ideal" population for

single-member districts.  This is determined by taking the total state population and dividing it

by the number of single-member districts for each legislative chamber.  In order to remain in

compliance with the Fourteenth Amendment's "One Person One Vote Standard," the population

in any one legislative district should endeavor to deviate no more than 10% from the "safe

harbor" of the ideal population. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1322 (N.D. Ga. 2004);

*Gray v. Sanders*, 372 U.S. 368 (1963).  The Georgia plans were – barely – within safe harbor

range (9.98%). *Larios v. Cox* at 1326-1327.  Nevertheless, the federal district court's 3-judge

panel struck down the Georgia Legislature's Redistricting Plan because of how, for politically

partisan reasons, it engineered the ideal population in districts to under-populate heavily

Democratic-leaning urban areas of the state (to achieve over-representation in the Legislature), while it over-populated heavily Republican-leaning rural and suburban areas of the state (to achieve under-representation). *Id.* at 1337-1338. In this respect the court held that:

> "[d]eviations from exact population equality may be allowed . . . to further legitimate state interests such as . . . avoiding incumbent pairings."

> *Id.* at 1337-1338 (emphasis added).

The court noted the State of Georgia did not meet its burden of showing the deviations were, in fact, necessary, to achieve legitimate, non-discriminatory legislative interests. Quite the opposite, the court found that the deviations were arbitrary and motivated by partisan considerations, and therefore unconstitutionally violated the One Person One Vote Standard. *Id.* at 38.

The court's analysis further examined the Georgia Democrats' disproportionate number of incumbent pairings for Republicans finding the disproportionate number of incumbent pairings was an unconstitutionally partisan gerrymander. The court observed that,

> "The [House Plan] paired forty-two incumbents, including thirty-seven of the seventy-four incumbent Republicans (50% of the Republican caucus), but only nine of the 105 incumbent Democrats (less than 9% of the Democratic caucus)."

> *Id.* at 1326.

The district court ordered a Special Master to re-draw the maps to correct the above-stated defects. The court's order stated that in re-drawing the maps, the Special Master was,

> "[s]trictly prohibited . . . from reviewing or analyzing political data and
> information, including, but not limited to, prior districts' voting
> performance, *incumbent residency*, political party registration and past
> election results."
>
> *Larios*, 314 F. Supp. 2d at 1361 (emphasis added).

With these instructions, the Special Master re-drew Georgia's district lines. However, the result

was a disproportionate number of incumbent pairings of African-American legislators in the

Georgia General Assembly, including approximately one half (46.15%) of the African-

Americans serving in the Georgia State House of Representatives. The Georgia Legislative

Black Caucus, via *amicus curiae*, petitioned the district court to re-consider the Special Master's

maps, in light of the disproportionate impact on minority voters' candidates of their choosing,

constituting, according to the Georgia Black Caucus, a violation of the Voting Rights Act. *Id.* at

1366-1367; f.n. 16. The district court ordered the Special Master to re-draw the revised maps to

cure the incumbent pairing defects which disproportionately impacted African-American voters

and legislators, in accordance with the Georgia Black Caucus' *amicus* petition. *Id.* at 1372. The

court explained:

> To the extent claims initially were made that the plans retrogressed
> because black incumbents in the Special Master's Original Plans were
> paired more frequently than white incumbents, the final Special Master's
> 1-B Plans, adopted by this Court, unpaired incumbents in a neutral manner
> and ultimately paired only four black incumbents and twenty-four white
> incumbents. *The Special Master's 1-B Plans unpaired the incumbents in a
> wholly neutral and impartial way, without concern to race or politics.*

> *Id.* at 1366 n.16 (emphasis added).

On appeal, the Supreme Court affirmed the district court's finding of unconstitutionality

under the One Person One Vote standard (even though the districts were within the 10% safe

20

harbor), and let stand the district court's re-drawing of incumbency pairings in majority-minority districts to avoid disproportionate and adverse impact on minority voters.  *Cox v. Larios*, 542 U.S. 947, *supra*.

The holding in *Cox v. Larios* stands for the proposition that a state's redistricting maps cannot have a disproportionate number of incumbency pairings for minority legislators.  As described above, the disproportionate number of incumbency pairings for minority legislators in Michigan, strips voters of color of their right to elect candidates of their choosing.

Other courts have reached the same conclusion, such as *Balderas v. State*, No. Civ. A. 6:01CV158, 2001 WL 34104833 (E.D. Tex. Nov. 28, 2001), where the court explicitly avoided minority incumbency pairings:

> "In Bexar County, the LRB plan reduced the number of majority Latino districts from seven to six. We reconstituted a seventh majority Latino district *without pairing any Latino incumbents* or splitting any Voter Tabulation Districts, and we equalized the level of Spanish surnamed registration (SSRV) among all seven Latino districts."

> *Id*. at *3 (emphasis added).

Moreover the United States Justice Department, in a case brought under Section 5 of the Voting Rights Act, objected to a map that forced a minority incumbent being paired with a White incumbent in a primary election that would have certainly forced-out the minority incumbent:

> "In the LRB plan District 35 paired a Latino incumbent and an Anglo incumbent in a district in which the Anglo had maintained a higher proportion of her constituents. Our modifications eliminate the pairing, maintaining a heavily Democratic District 35 with no incumbent, and an SSRV of 51.5%."

> *Id*.

21

IV.

**THE CRACKING OF THE LATINO COMMUNITY
IN SOUTHWEST DETROIT CONSTITUTESINTENTIONAL
DISCRIMINATION IN VIOLATION OF THE FOURTEENTH
AMENDMENT'S EQUAL PROTECTION CLAUSE**

The intentional division of the Latino community in Southwest Detroit violates Section 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment. *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006).

Under the State Map more than half of the Latino community has been divided among two adjacent districts, with 24% and 17% HVAP respectively, in contrast to the Black Caucus' map which kept the Latino community whole with a 42.74% HVAP. Given that this cracking of the community has been attempted three times in the last three Redistricting cycles by Republicans in control of the Redistricting Process, this cracking is a willful and knowing effort to dilute the voices of Latino voters who will see their political clout diminished and their ability to speak cohesively in the political process weakened.

Even while Michigan has lost population over the last decade, the Latino population in Detroit has grown as a share of the city's population. In the 2000 Census, Detroit was shown to contain 30,237 Hispanic residents of voting age, and the HVAP was 4.6%. The 2010 Census showed that the number of Hispanic residents of voting age has held steady at 30,158, but that the HVAP had grown to 5.8% HVAP in Detroit. The figures are similar for Wayne County as a whole. In 2000, Wayne County had 49,334 Hispanic residents of voting age, comprising 3.3%

22

of the voting-age population.  In 2010, the number of Hispanic residents 18 years and over

climbed by roughly 10,000 to 59,133, and the HVAP increased accordingly to 4.4%.

In the face of this population growth in the Latino community as compared to other

populations in Michigan, the State dealt with this by breaking up the single district in the House

of Representatives where the Latino community has the largest numbers.

In *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006), the Supreme

Court addressed a claim for vote dilution under Section 2 of the Voting Rights Act, as well as an

Equal Protection challenge to the 2003 Texas Redistricting Plan, when the Texas Plan cracked

District 23: a majority-minority (57.5% Latino) district.  The Court held that the Texas Map,

which reduced the Latino community's vote to 46%, diluted the Latino vote in violation of

Section 2 of the Voting Rights Act.  The court found that the Latino community had been

cracked to protect an incumbent Republican, Rep. Henry Bonilla, who had won in 2002 with

"only 8% of the Latino vote."  *Id.* at 423-24.

The court explained that the map was drawn to frustrate

> "[a]n increasingly powerful Latino population that threatened to oust the
> incumbent Republican... District 23's Latino voters were poised to elect
> their candidate of choice.  They were becoming more politically active,
> with a marked and continuous rise in Spanish-surnamed voter registration.
> In successive elections Latinos were voting against Bonilla in greater
> numbers, and in 2002 they almost ousted him."
>
> *Id.* at 438-439.

23

Justice Kennedy's analysis went so far as to say this conduct approximated intentional racial discrimination (though the case was resolved on Voting Rights Act grounds):

> "In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation."

> *Id.* at 440.

As noted above, the Court did not decide the case on Fourteenth Amendment grounds, but clearly federal courts may grant appropriate relief upon a finding of intentional discrimination when an "*emergent*" and mobilized minority community is "*poised*" to act in a politically cohesive manner, and its newfound "*efficacious political identity*" is deliberately frustrated. *Id.* at 428, 438 (emphasis added).

Another case directly on point is *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990). In this case the Court affirmed the federal district court in addressing a pattern and practice of the Los Angeles County Board of Supervisors which moved district lines in the Latino community, over the course of four successive Redistricting Plans, to frustrate the Latino community's growing political clout. The challenged maps were drawn in a way that prevented the Latino community (under 50% majority) from becoming a plurality decision-maker in local elections. *Id.* at 767 n.1.

The lower court's findings in regards to the L.A. County Supervisors conduct, has striking parallels with Michigan's Redistricting Plan:

- 68. The Board's action transferred between 50,000 to 100,000 voters from District 4 into District 3 and had the effect of substantially decreasing the proportion of Hispanic voters in District 3.  [1959 Redistricting]

24

- 109. In 1971, District 3 lost some areas with substantial Hispanic population on its eastern border. [1971 Redistricting]

- 112. The Court finds that the Board has redrawn the supervisorial boundaries over the period 1959-1971, at least in part, to avoid enhancing Hispanic voting strength in District 3, the district that has historically had the highest proportion of Hispanics and to make it less likely that a viable, well financed Hispanic opponent would seek office in that district. This finding is based on both direct and circumstantial evidence, including the finding that, since the defeat of Edward Roybal in 1959, no well-financed Hispanic or Spanish-surname candidate has run for election in District 3. [Overall Intent of Past Redistrictings]

- 127. From a political perspective, since Hispanic population growth was most significant in Districts 1 and 3, if the 1971 boundaries were changed in any measurable way to eliminate the existing fragmentation, the incumbency of either Supervisor Schabarum or Supervisor Edelman would be most affected by a potential Hispanic candidate. [1981 Redistricting]

- 157. [Boundary Committee Members] Smith and Hoffenblum opposed the CFR [Chicanos for Fair Representation] plan because the plan proposed increasing the Hispanic proportion in District 1 from 36 to 42 percent. . . . [1981 Redistricting]

- 162. Supervisor Edelman would not rule out the possibility that ethnic considerations played at least some part in the rejection by the Board majority of the CFR Plan. Moreover, the fact that CFR proposed a plan in which District 1 had a 42 percent Hispanic population was a possible basis for the rejection of the plan by the majority. Supervisor Schabarum would not accept a 45 or 50 percent Hispanic proportion in his district in 1981. [1981 Redistricting]

- 175. The plan adopted in 1981 retained the boundary between the First and the Third Supervisorial Districts, the districts that contain the largest proportions of Hispanics. In doing so, the 1981 Plan continued to split the Hispanic Core almost in half. [1981 Redistricting]

- 176. The Board appeared to ignore the three proposed plans which provided for a bare Hispanic population majority. [1981 Redistricting]

- 178. The Court finds that in 1981 the five members of the Board of Supervisors were aware that the plan which they eventually adopted would continue to

fragment the Hispanic population and further impair the ability of Hispanics to gain representation on the Board.  [1981 Redistricting]"

*Garza, supra,* at 767.

Under some circumstances, a majority of minority voters (50 plus 1%) has been required to state a claim under Section 2 of the Voting Rights Act. *Bartlett v. Strickland*, 129 S. Ct. 1231, 1244-46 (2009).   And the Southwest Detroit district, remaining whole, has a 42.7% HVAP. Nevertheless, the Court stated that "Our holding does not apply to cases in which there is intentional discrimination against a racial minority." *Id.* at 1246.  Justice Kennedy elaborated on this as he wrote"[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id.* The conduct Justice Kennedy describes is the subject of the instant action.

In an analysis of its maps issued after *NAACP v. Austin*, 857 F. Supp, 575, *supra*, was filed, the Michigan Supreme Court found that "[r]edrawing district lines with an eye only towards maximizing the number of majority-black districts, probably would have required that the Hispanic population be split into different districts." *Id.* at 565.  But the split was avoided, even though a consequence had been preventing a fifth majority-black Senate district with impermissible racial considerations in mind. *Id.* at 573-74.  Plaintiffs argued this was "at least partially motivated by a desire to keep the white communities of Harper Woods and the Grosse Pointes from being placed in a fifth, majority-black district, and a desire to minimize the total number of electorally effective majority-black districts." *Id.* at 573.

26

The Michigan Supreme Court took the above arguments into account, regarding the need for a 5th majority-minority (African-American) state senate district, and gave ultimate weight and deference to the need to preserve the cohesive political voice of the Latino community in Southwest Detroit. That was twenty years ago. Now, the Latino community's political voice is even more important, having grown larger.

At the very time that the U.S. Census reflects significant growth of the Latino electorate, the State has adopted a Redistricting Plan to frustrate this newfound political clout. If it was not acceptable twenty years ago (even though it meant one less Black state senate district), it is certainly not legally acceptable today.

Given these realities, the State's cracking of the Latino community in Southwest Detroit violates the Equal Protection Clause of the Fourteenth Amendment and Section 2 of the Voting Rights Act, as it was done to frustrate the Latino community's growing clout in the political process.

## V.

### PLAINTIFFS CLAIMS MEETS THE TEST FOR GRANTING INJUNCTIVE RELIEF

#### A.

#### Plaintiffs are Entitled to Injunctive Relief

There is a four (4) part test to be employed in determining whether a district court should grant a motion for preliminary injunctive relief when the movant demonstrates: (1) a strong likelihood that the movant will prevail on the merits, (2) that the movant will suffer irreparable injury unless the injunction issues, (3) that the threatened injury outweighs whatever damage the

proposed injunction may cause the opposing party, and (4) that the injunction will of service to the public interest. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003). And these four factors must "[b]e balanced, not perquisites that must be met." *Id.*

### 1.

### Plaintiffs are likely to Prevail on the Merits

In legislative redistricting, the Fourteenth Amendment and the 1965 Voting Rights Act prohibit discriminatory incumbent pairings which strip voters of color of their opportunity to elect candidates of their choosing as the State Map has done in its districts for the House of Representatives in the City of Detroit (*Cox v. Larios*, 542 U.S. 947 (2004)), and they prohibit the cracking of a community of color which frustrates that community's ability to speak with a politically cohesive voice as the State Map has done by its division of the Latino community in Southwest Detroit (*League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006). Redistricting is primarily the duty of the legislature. *Reynolds v. Sims*, 377 U.S. 533 (1964). However, the federal courts are required to intervene in the event that the legislature has failed to meet its federal constitutional mandates, as Michigan's State Map has failed to do. *Upham v. Seamon*, 456 U.S. 37, 41 (1982); See also, *Connor v. Finch*, 431 U.S. 407, 415 (1977)(It is the "*unwelcome obligation*" of the federal courts to intervene when a State legislative plan is constitutionally defective).

### 2.

### Plaintiffs will Suffer Irreparable Harm if an Injunction does not Issue

The equal right to vote is one of the most fundamental rights we have as Americans. *Reynolds v. Sims, supra,* at 561-562. And "[a]ny illegal impediment to the right to vote, as

28

guaranteed by the U.S. constitution or status, would by its very nature be an irreparable injury."
Harris v. Graddick, 593 F. Supp. 128 (M.D. Ala. 1984).  If not corrected by the court, through
injunctive relief, Plaintiffs will be denied their constitutional right, in the 2012 Primary and
General elections, to not have candidates of their choice because of discriminatory incumbent
pairings and because of a discriminatory cracking of the Latino electorate in Southwest Detroit,
frustrating that community's ability to speak with a politically cohesive voice.

### 3.

### Injunctive Relief will Not Harm Defendants

Redistricting maps which strip voters of color of their opportunity to elect candidates of
their choice because of discriminatory incumbent pairings, and which crack the Latino electorate
to frustrate that community's ability to speak with a politically cohesive voice, in violation of the
Fourteenth Amendment and the 1965 Voting Rights Act, irreparably harms Plaintiffs.  And
Defendants have no rights to conduct elections and have voters rights abridged and have
candidates hold office under illegal circumstances. *Wallace v. House*, 377 F. Supp. 1192 (W.D.
La. 1974).

Moreover, the relief sought by Plaintiffs can be readily and expeditiously accomplished.
Plaintiffs have already provided maps, through its mapping expert, to the State which (1) have no
discriminatory incumbent pairings, and (2) which keep the Latino community in Southwest
Detroit whole, and (3) which maps scored *higher* than the State's maps on the objective "Apol"
redistricting criteria. (MCL 4.261; See also Dan Fox Affidavit).  The Court and/or its Special
Master can readily and expeditiously conduct an examination of same, for comparison to the
State Map, which on its face does not meet the standards of the Fourteenth Amendment and the
1965 Voting Rights Act.

**4.**

**Injunctive Relief Would be in the Public Interest**

The right to vote is one of the most fundamental rights afforded to Americans in our system of government. *Reynolds v. Sims, supra,* 377 U.S. at 555.  Federal courts in Michigan have stepped in to grant injunctive relief when the right to vote was being abridged. *Detroit Branch NAACP v. Michigan State Republican Committee*, C.A. No. 05-74296 (E.D. Mich. 2005)(Granting Plaintiffs motion for temporary restraining order to halt harassment of African American voters in line at polling locations in City of Detroit).  The public has a substantial interest in having the State Maps corrected, to comply with constitutional and federal statutory requirements so that their right to vote will not be abridged.

**VI.**

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Temporary Restraining Order, Preliminary Injunction and Appointment of Special Master.

Respectfully submitted,

/s/Melvin Butch Hollowell
MELVIN BUTCH HOLLOWELL (P-37834)
Detroit Branch NAACP
8220 Second Avenue
Detroit, Michigan 48221
313-871-2087
butchhollowell@gmail.com

JAMES P. ALLEN (P-52885)
HARRY KALOGERAKOS (P-53544)
KELLY L. CUMBERWORTH (P-70872)
Allen Brothers, PLLC
400 Monroe, Suite 220
Detroit, Michigan 48226
313-962-7777
jamesallen@allenbrotherspllc.com

LAWRENCE GARCIA (P-54890)
Garcia Law Group, PLLC
3011 W. Grand Blvd.
Fisher Building
Detroit, Michigan 48202
877-643-6255
lgarcia@garcialawgrouppllc.com

ALAN L. CANADY (P-35052)
Attorney at Law
P.O. Box 309
Lansing, Michigan 48826
517-256-9117
alcanadyconsulting@gmail.com


ATTORNEYS FOR PLAINTIFFS


DATED: December 8, 2011

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

NATIONAL ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE, DETROIT BRANCH, FRED
DURHAL, Jr., in his Official Capacity as MICHIGAN
LEGISLATIVE BLACK CAUCUS CHAIR, THE INTERNATIONAL
UNION, UNITED AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA
(UAW), LATINO-AMERICANS FOR SOCIAL AND
ECONOMIC DEVELOPMENT (LA SED), ANTHONY
BENEVIDES, RAQUEL CASTANEDA LOPEZ, ANGELITA
ESPINO, SHERRY G.DAGNOGO, KENNETH WHITTAKER,
CHRISTOPHER WILLIAMS,

        Plaintiffs,

v.                                             Civil Action No.

RICK SNYDER, in his Official Capacity as Governor
of the State of Michigan, RUTH JOHNSON, in her Official
Capacity as Secretary of State for the State of Michigan,

        Defendants.

_____/

### CERTIFICATE OF SERVICE

    I herby certify that on **December 8, 2011**, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification to the interested parties.

                                Allen Brothers, PLLC

                                /s/Veronica Durr_____

                                400 Monroe, Suite 220

                                Detroit, MI 48226

                                (313) 962-7777

1