# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

NAACP, DETROIT BRANCH, et al.,

      Plaintiffs,

MICHIGAN DEMOCRATIC PARTY,

      Intervenor Plaintiff,          **Civil Action No.**
                                              **11-15385**

vs.

RICHARD SNYDER, et al.,                   **OPINION AND ORDER**

      Defendants,

MICHIGAN REPUBLICAN PARTY,

      Intervenor Defendant.

_____/

**BEFORE:    CLAY, Circuit Judge; FRIEDMAN and MALONEY, District Judges.**

    **PER CURIAM.**  Following the 2010 decennial census, Michigan enacted a new statewide redistricting plan on August 9, 2011.  (S.B. 498, 96 Leg., Reg. Sess. (Mich. 2011) (hereinafter "the Plan")).  Plaintiffs, a coalition of civil rights groups, a union, and several Michigan residents, filed this action against state officials contending that the Plan violates minority voters' rights protected under Article I, § 2 of the United States Constitution; the Fourteenth Amendment's Equal Protection Clause; the Constitution's One-Person, One-Vote standard; and Section 2 of the Voting Rights Act of 1973, 42 U.S.C. §§ 1973–1973aa-6.  Shortly thereafter, the Michigan Democratic Party and the Michigan Republican Party, along with several of their individual party members, joined the case as Intervening Plaintiffs and Intervening Defendants, respectively.  At the Defendants' request, a three-judge court was convened pursuant to 28 U.S.C. § 2284 on February 22, 2012.

Before the Court are State Defendants' Motion to Dismiss for failure to state a claim (Dkt. No. 39) and Intervening Defendants' Motion for Judgment on the Pleadings (Dkt. No. 35). The motions have been fully briefed and were argued before the three-judge court on March 23, 2012. The motions are now ripe for decision. For the reasons set forth below, we **GRANT** both motions and **DISMISS** the case.

## BACKGROUND

The United States Constitution mandates that a federal census be conducted every ten years. U.S. Const. art. I, § 2. By state statute, Michigan also uses the national census data to redistrict its state senate, comprised of 38 representatives, and its house of representatives, comprised of 110 representatives, on a decennial basis. *See* Mich. Comp. Laws §§ 3.62, 4.261. In formulating its state redistricting plan, the Michigan legislature must comply with federal constitutional requirements and Sections 2 and 5 of the Voting Rights Act.[1] Additionally, Michigan has set out a series of statutory guidelines for its state redistricting process, often referred to as the "Apol standards."[2] Mich. Comp. Laws § 4.261. The Apol standards require Michigan's districts to respect, *inter alia*, principles of convenience; contiguity; county, city, and township boundaries; and compactness. *See id.*

The 2010 census data was delivered to Michigan on March 22, 2011. Michigan's results were not good. Michigan was the only state in the country to lose population, declining from

---

[1]Because two Michigan townships are considered "covered jurisdictions" under Section 5, Michigan must submit its proposed redistricting plans for preclearance to either the Department of Justice or to a three-judge court for the United States District Court for the District of Columbia to ensure that the plans are not retrogressive.

[2]The Apol standards are named after Michigan's former elections director, Bernie Apol.

9,938,444 persons in 2000 to 9,883,640 persons in 2010.[3] The City of Detroit was struck especially harshly, with its population declining from 951,270 persons in 2000 to 713,777 persons in 2010.[4] The loss amounted to a 25% decline in Detroit's population. *See* Katherine Q. Seelye, *Detroit Census Confirms a Desertion Like No Other*, N.Y. Times, March 23, 2011, at A1.

Detroit's dramatic population loss meant that it would lose two of its twelve state representative districts in the 2010 redistricting process. In determining how to reapportion the City's districts, the state legislature's redistricting committee held public hearings and also solicited the input of the Michigan Legislative Black Caucus ("the MLBC"). As part of their discussions, the MLBC proposed alternative districting maps. For purposes of these motions, the MLBC's maps differed in two important respects. First, they avoided pairing incumbent representatives against one another, and second, they left the Latino-American community located in the City's southwest portion intact within a single district. Despite their negotiations, the redistricting committee ultimately rejected the MLBC's maps and enacted the Plan now signed into law as S.B. 498.

On November 2, 2011, the state sought a declaratory judgment preclearing three of its statewide redistricting plans, including S.B. 498, as in compliance with Section 5 of the Voting Rights Act. A three-judge federal court of the United States District Court for the District of Columbia officially precleared Michigan's 2010 state redistricting plans on February 28, 2012. *See Michigan v. United States*, Order, No. 1:11-cv-01938 (Feb. 28, 2012).

The Plan splits Detroit into ten districts, each with an African-American majority. Detroit's

---

[3]U.S. Census Bureau, Michigan Census Data: QuickFacts Summary 2010, Issued 2011, available at http://quickfacts.census.gov/qfd/states/26000.html.

[4]U.S. Census Bureau, *Detroit Census Data: QuickFacts Summary 2010*, Issued 2011, *available at* http://quickfacts.census.gov/qfd/states/26/2622000.html.

Latino-American population resides largely in the southwest portion of the City. Under the 2000 districting plan, this community was consolidated within a single district, District 12, where it represented a minority of the voting-age population. The new plan splits the Latino-American community between two majority African-American districts, Districts 5 and 6, which now contain a 24.53% and a 17.26% Latino-American voting-age population, respectively. Four of the newly drawn districts also now contain more than one incumbent representative, which may force out as many as five of the legislature's fourteen minority representatives.[5] By contrast, Plaintiffs allege that only two out of the state's ninety-six Caucasian representatives are paired under the Plan.

In the present action, Plaintiffs and Intervening Plaintiffs argue that the Plan violates the Voting Rights Act and the United States Constitution by splitting Detroit's Latino-American population into two districts and by disproportionately pairing minority incumbents in an effort to dilute the minority vote.

Defendants and Intervening Defendants have moved to dismiss and for judgment on the

---

[5]Although the parties did not provide the Court with any information about the race or party affiliation of the affected incumbents, we may take judicial notice of readily accessible, publicly available information. *See Ctr. for Bio-Ethical Reform v. Napolitano*, 648 F.3d 365, 373 n.2 (6th Cir. 2011).

The affected incumbents are: Reps. Tim Bledsoe (D) and Alberta Tinsley Talabi (D) (matched in the new District 2); Reps. Lisa L. Howze (D), John Olumba (D), and Jimmy Womack (D) (matched in the new District 3); Reps. Rashida Talib (D) and Maureen L. Stapleton (D) (matched in the new District 6); Reps. Thomas Stallworth (D) and Phil Cavanaugh (D) (matched in the new District 10). *See generally* Michigan House Democratic Caucus, *Individual Representatives' Webpages*, 2011, *available at* http://www.housedems.com.

Representatives Tinsley Talabi, Howze, Olumba, Womack, Stapleton, and Stallworth are African-American and are current or former members of the MLBC; Representative Talib is Arab-American; and Representatives Bledsoe and Cavanaugh are Caucasian. *See id.*; Press Release, Michigan Legislative Black Caucus, *Representative Fred Durhal (D-Detroit) Will Lead the 2011-2012 Michigan Legislative Black Caucus* (Dec. 1, 2010), *available at* http://www.michiganlbc.org/news.html.

pleadings.  Because their motions raise essentially the same arguments, we consider them together.[6]

This three-judge court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201 *et seq*.

## ANALYSIS

### I.     STANDARD OF REVIEW

A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss brought under Rule 12(b)(6).  *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007).  Both motions test the sufficiency of the pleadings to determine whether they have stated a claim upon which relief can be granted.

In order to survive a motion for dismissal, a complaint must present allegations of fact that "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although the pleadings need not contain "detailed factual allegations," they must nevertheless go beyond labels, conclusions, and a formulaic recitation of the elements of a cause of action.  *Id*. at 570.  In doing so, the complaint must plead "sufficient factual matter" that, if accepted as true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A claim is plausible on its face if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

In reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor.  *Hunter v. Sec'y of United States Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting

---

[6]For ease of reference, we also refer to the parties collectively as "Plaintiffs" and "Defendants."

*Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009)). This principle does not extend, however, to legal conclusions stated as facts or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).

## II. LEGAL FRAMEWORK

### A. One-Person, One-Vote Standard

Article I, Section 2 of the United States Constitution provides that members of the House of Representatives are to be chosen "by the People of the several States." U.S. Const. art. I, §2. The Supreme Court has interpreted this provision to mean that "as nearly as practicable one [person's] vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964). "[T]he 'as nearly as practicable standard' requires the state to make "a good-faith effort to achieve precise mathematical equality" in its districting. *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)). "Unless population variances among [the] districts are shown to have resulted despite such effort," the state "must justify each variance, no matter how small." *Id.* at 531. Commonly referred to as the "One-Person, One-Vote standard," the holdings of *Wesberry* and *Kirkpatrick* are the *sine qua non* of all redistricting law, establishing that the originating principle in all redistricting plans must be to achieve, as best possible, equally populated districts.

The federal One-Person, One-Vote standard also applies to state elections and state redistricting plans. *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004). The Supreme Court has tolerated greater population deviations in state legislative plans, however, at least when the deviations are justified by legitimate considerations. *See Brown v.*

*Thomson*, 462 U.S. 835, 850 (1983) (O'Connor, J., concurring); *Karcher v. Daggett*, 462 U.S. 725, 730 (1983). A plan that exhibits population disparities over 10%, however, triggers a *prima facie* One-Person, One-Vote violation and requires an explanation from the state. *See Brown*, 462 U.S. at 850 (O'Connor, J., concurring).

In Michigan, the state has adopted its own more stringent One-Person, One-Vote standards. As part of the Apol criteria, the state only tolerates a 5% population variance, with an even stricter 2% variance applied to certain enumerated urban areas. *See* Mich. Comp. Laws § 4.261.

### B. The Equal Protection Clause

Along with the One-Person, One-Vote standard, the Fourteenth Amendment's Equal Protection Clause also prohibits the use of race as the sole or predominant factor in constructing district lines, unless doing so satisfies strict scrutiny. *Fletcher v. Lamone*, No. 11-cv-3220, 2011 WL 6740169, at *11 (D. Md. Dec. 23, 2011) (citing *Easley v. Cromartie*, 532 U.S. 234, 241 (2001); *Bush v. Vera*, 517 U.S. 952, 958–59 (1996) (O'Connor, J., plurality)). To some extent, however, the redistricting process will "almost always be aware of racial demographics." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Accordingly, a redistricting plan does not violate equal protection simply because it takes racial demographics into account. *Id*. Rather, the consideration of race in redistricting is only problematic if the state "subordinate[s]" traditional, "legitimate districting principles" in order to serve the goal of racial gerrymandering. *Vera*, 517 U.S. at 958–59 (citing *Miller*, 515 U.S. at 916). If a plaintiff can prove that a plan has no rational explanation, "other than [as an] effort to separate voters into districts on the basis of race," then we apply strict scrutiny, and the plan only survives if it is the least restrictive, narrowly tailored means for achieving a compelling governmental interest. *Miller*, 515 U.S. at 903; *Shaw v. Reno*, 509 U.S. 630, 649 (1993) ("*Shaw I*").

Without such a showing, however, the plan survives so long as it satisfies rational basis review, that is, that the plan is rationally related to a legitimate government interest. *See Vera*, 517 U.S. at 1010 (Kennedy, J., concurring).

### C. Section 2 of the Voting Rights Act

In addition to these constitutionally compelled concerns, Section 2(b) of the Voting Rights Act prohibits any voting practice or procedure which results in "the denial or abridgment of the right of any citizen of the United States to vote on account of race, color, or [language]." 42 U.S.C. § 1973(a). A Section 2 violation is established if, based on the totality of the circumstances, "it is shown that the political processes . . . are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

Section 2 is a "flexible, fact-intensive" doctrine, the "essence" of which is triggered when "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 46, 47 (1986). In contrast to an equal protection claim, a Section 2 claim does not require a showing of discriminatory intent and may be proved by an election procedure's discriminatory effects alone. *Id*. at 35.

In order to establish that a challenged districting map has a disparate impact on minority voters, a plaintiff bringing a Section 2 claim must first satisfy three necessary preconditions (the "*Gingles* preconditions"):

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district . . . . Second, the minority group must be able to show that it is politically cohesive . . . . Third, the majority must be able to demonstrate that the [] majority votes sufficiently

> as a bloc to enable it . . . in the absence of special circumstances . . . to defeat the minority's preferred candidate.

*Id.* at 50–51 (internal citations omitted). If the *Gingles* preconditions are satisfied, the plaintiff must then demonstrate that the totality of circumstances shows that the minority group does not possess the same opportunities to participate in the political process as other voters. *See id.* at 48–49. Factors relevant in this functional inquiry include, "the lingering effects of past discrimination," "the use of appeals to racial bias in election campaigns," and the use of electoral devices which tend to dilute the minority vote, such as anti-bullet voting laws and majority vote requirements. *Id.* at 51 n.15.

With this framework in mind, we now turn to the Plaintiffs' claims.

## III. THE DIVISION OF THE LATINO-AMERICAN COMMUNITY CLAIM

Plaintiffs' first claim alleges that the Plan "has the purpose and result of denying or abridging the right of Latino-American voters in Southwest Detroit," by dividing the Latino-American community between two districts, one with a 24.53% Hispanic voting-age population and the other with a 17.26% Hispanic voting-age population. Plaintiffs suggest that the legislature could have kept the Latino-American population intact by creating a single district with a 42.74% Latino-American population, as the MLBC suggested in its alternative plan. Plaintiffs allege that by refusing to accept the MLBC's proposal, the legislature "intentionally divided the rapidly-growing Latino community in Southwest Detroit in half, to diminish and weaken the political strength of Latino voters [to] speak with a politically cohesive voice." Plaintiffs also assert that the plan has the effect of "depriv[ing] Latino voters in Southwest Detroit of [their] ability to act in a politically cohesive manner." Plaintiffs argue that this "cracking" of the Latino-American community violates Section 2 and the Equal Protection Clause.

**A.      Section 2 of the Voting Rights Act**

Plaintiffs' "cracking" claim invokes one of "the most common means of manipulating the voting strength of a politically cohesive minority." *Fletcher*, 2011 WL 6740169 at *8. Because "[a] politically cohesive minority group that is large enough to constitute a majority in a single-member district has a good chance of electing its candidate of choice," the division of a minority group among multiple districts in order to ensure that the "minority is a majority in none" is a method of racial gerrymandering aimed at preventing the minority group from electing its candidate of choice. *Id*. (quoting *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993)). So long as the majority in each district votes as a bloc against the minority's preferred candidate, cracking a minority population virtually ensures that "the fragmented minority group will be unable to muster sufficient votes in any district to carry its candidate to victory." *Id*. To make out a Section 2 voter dilution claim based on a "cracking" theory, a plaintiff must show racially discriminatory effects through the three *Gingles* preconditions, as well as demonstrate that the totality of the circumstances justify judicial relief. *See Gingles*, 478 U.S. at 50–51. With this claim, we devote special attention to *Gingles*' first factor, as it presents the most obvious challenge to Plaintiffs' complaint.

**1.      The First *Gingles* Precondition – The Size of the Latino-American Community**

The first *Gingles* precondition requires Plaintiffs to demonstrate that the Latino-American minority group is "sufficiently large and geographically compact" to constitute a majority in a single member district. Where the minority group in a proposed district would constitute "a numerical, working majority" of the voting-age population, i.e., where the minority constitutes over 50% of the voting-age population, the district is commonly called a "minority-majority" district. In a minority-majority district, the minority is "sufficiently large" enough to meet *Gingles*' first precondition. *See*

*Bartlett v. Strickland*, 556 U.S. 1, 12 (2009).  When a minority could comprise one or more majority-minority districts, Section 2 may require that a redistricting plan draw those districts in such a way as to guarantee equal access to the political process.  *Id.*

**(a)**     ***Bartlett*'s Strict Numerical Majority Threshold**

Meeting the "sufficiently large" requirement, however, is significantly more complicated when the proposed minority group does not constitute a strict numerical majority.  Recently, in *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Supreme Court directly addressed the question of "[w]hat size minority group is sufficient to satisfy the first *Gingles* requirement."  *Id*. at 12.  Prior to *Bartlett*, the Court had already held that Section 2 does not require the creation of so-called "influence districts," defined as those "in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected."  *Id*. at 13 (citing *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 445 (2006) (Kennedy, J., plurality)).  In *Bartlett,* however, the Court was confronted with an "intermediate type of district," called a "crossover district," in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with [the] help from voters who are members of the majority and who cross over to support the minority's preferred candidate."  *Id*. (internal citation omitted).

Ultimately, while the Court recognized that a strict-numerical-majority rule is a somewhat imperfect means of measuring whether a minority group has the power to elect the representative of its choice, a plurality of the Court agreed that when minority voters cannot dictate electoral outcomes independently, they have no right under Section 2 to the creation of a district where the minority would require the "assistance of others" in order to elect its preferred candidate.  *Id*. at 14–15.  Accordingly, in order to meet *Gingles*' first precondition, the minority group must comprise at least

a numerical majority of the proposed district's voting-age population. *Id.* at 18–19.

Applying *Bartlett* to the present case, Plaintiffs' cracking claim automatically fails to state a claim based on the numbers. Plaintiffs admit that, under their suggested plan, the Latino-American voting-age population would comprise only 42.74% of their proposed district. Consequently, Plaintiffs' proposed district fails to meet *Gingles'* first precondition, and their Section 2 claim must fail.

### (b)    Plaintiffs' Proposed Exceptions to the *Bartlett* Rule

Plaintiffs urge that we need not apply *Bartlett*'s strict numerical threshold for two reasons. First, they point out that their proposed district would, in fact, meet the majority-minority requirement, because it would contain a 42.7% Latino-American voting-age population and a 29.5% African-American population, for a total 72.2% minority voting-age population. Second, they argue that *Bartlett*'s holding specifically does not apply to those cases in which a claim of intentional discrimination against a racial minority is being raised.

Plaintiffs' first argument asks us to create a "coalition district," a concept which is conceptually similar to, though functionally distinct from, a crossover district. *See Bartlett*, 556 U.S. at 13.[7] Although the *Bartlett* Court foreclosed the use of crossover districts that do not meet the numerical majority-minority threshold, the Court took no position on the propriety of coalition districts under Section 2. *Id*. at 13–14.

The majority of our sister circuits have extended Section 2 protection to minority coalition

---

[7]A crossover district is distinguishable in that it requires the participation of majority voters to elect the candidate of the minority's choice, whereas a true minority coalition district involves the coming together of two or more minority groups to elect the candidate of the coalition's choice, without the need for majority's participation. *Bartlett*, 556 U.S. at 13.

groups. *See, e.g.*, *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc); *Badillo v. City of Stockton*, 956 F.2d 884, 891 (9th Cir. 1992); *Concerned Citizens v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524 (11th Cir. 1990); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, No. 03-cv-502, 2003 WL 21524820, at *5 (N.D.N.Y. July 7, 2003); *France v. Pataki*, 71 F. Supp. 2d 317, 327 (S.D.N.Y. 1999); *Latino Political Action Comm. v. City of Boston*, 609 F. Supp. 739, 746 (D. Mass. 1985), *aff'd* 784 F.2d 409 (1st Cir. 1986). Additionally, the Supreme Court has thrice assumed (without deciding) that minority coalition groups may be used to establish a claim under the Voting Rights Act. *See Bartlett*, 556 U.S. at 13; *Johnson v. De Gandy*, 512 U.S. 997, 1020 (1994); *Growe v. Emison*, 507 U.S. 25, 41 (1993).

An *en banc* panel of this Circuit, however, has disagreed. *See Nixon v. Kent Cnty.*, 76 F.3d 1381, 1393 (6th Cir. 1996) (en banc). The Sixth Circuit specifically precludes the use of coalition minority groups to make out a Section 2 claim, and despite our Court's minority stance on this subject, *Nixon* is binding precedent that controls our decision today. *See Sykes v. Anderson*, 625 F.3d 294, 319 (6th Cir. 2010). *Nixon* therefore precludes Plaintiffs from proceeding past *Gingles'* first precondition under a minority coalition group theory.[8]

In order to avoid the otherwise preclusive effects of *Bartlett* and *Nixon*, Plaintiffs next argue that neither case applies to Section 2 claims involving allegations of intentional discrimination. At least as to *Nixon*, Plaintiffs' argument is unavailing. Dicta in that case strongly suggests that the Sixth Circuit would not draw Plaintiffs' suggested distinction. *See Nixon*, 76 F.3d at 1390–91. Plaintiffs' argument may be more plausible in regard to *Bartlett*, because in that case the Court reserved its

---

[8]As discussed later in this opinion, even if the Sixth Circuit permitted Section 2 claims based on minority coalition districts, Plaintiffs' claim fails to plead *Gingles'* second and third preconditions. *See infra* at section III(A)(2).

decision as to whether the 50% majority threshold applies to cases involving claims of intentional discrimination. *See Bartlett*, 556 U.S. at 20 (Kennedy, J., plurality). However, *Bartlett* only stands, at best, for the fact that the Supreme Court has not yet ruled on this issue.

For the purposes of these motions, however, we need not stake out our position on this issue today. Whatever the merits of Plaintiffs' proposed intentional discrimination exception, it is clear that their claim fails under Section 2's less stringent disparate impact theory. Assuming, for the purposes of this motion only, that Plaintiffs' cracking claim can survive at all, it necessarily must proceed along the more burdensome theory of intentional discrimination. Therefore, we next turn our attention towards whether Plaintiffs have sufficiently pleaded intentional discrimination, along with the remaining *Gingles* preconditions, for Plaintiffs' Section 2 claim to survive Defendants' motions for dismissal.

Plaintiffs claim that Defendants "willfully and knowingly" created a district that split Detroit's Latino-American community into two districts and which "intentionally divided the rapidly-growing Latino community in half, to diminish and weaken the political strength of Latino voters [to] speak with a politically cohesive voice."

To begin with, Defendants concede that the legislature willingly and knowingly enacted a districting plan that split the Latino-American community of Southwest Detroit. They contend that this decision, however, was not driven by an intent to discriminate against Latino-American voters. Rather, Defendants explain that their plan was adopted over the MLBC's alternative because the MLBC's map would have created a *prima facie* Section 2 claim for an African-American voter. Defendants point out that, in order to create the proposed 42.74% Latino-American district, they would have had to dismantle one of Detroit's ten preexisting African-American majority districts.

Apart from unadorned accusations, Plaintiffs provide no information to plausibly infer that triable issues of fact remain to rebut Defendants' explanation. In fact, Plaintiffs concede that the destruction of an African-American majority district was a concern that animated the MLBC's pretrial negotiations with the legislature's redistricting committee. Nevertheless, Plaintiffs maintain that they told Defendants they preferred a map containing nine African-American majority districts and one coalition district over a plan with ten African-American majority districts. Plaintiffs contend that Detroit's civil rights community assured the state that it would not be sued if the MLBC's map was adopted. Plaintiffs claim that Defendants' refusal to cooperate in the face of their reassurance is circumstantial evidence proving intentional discrimination.

However, the problem with Plaintiffs' argument is that neither the MLBC nor any of the other civil rights organizations involved could possibly prevent an independent, dissatisfied African-American voter from bringing such a suit. Accordingly, their plan asked the legislature to risk violating Section 2 in the service of creating a coalition district that would have stood, at best, on tenuous legal footing. That the legislature chose not to adopt that suggestion is itself a powerful inference against Plaintiffs' claims of discriminatory intent. *See Miller*, 515 U.S. at 915 ("Although race-based decisionmaking is inherently suspect, until a claimant makes a showing sufficient to support that allegation the good faith of the legislature must be presumed.").

Finally, Plaintiffs vaguely contend that there is a history of racial discrimination against Detroit's Latino-American community, and that this area of the city has been targeted for cracking in each of the past three redistricting cycles. Normally, Plaintiffs' perfunctory allegation would not be entitled to this Court's deference, even at this early pleading stage. *See Iqbal*, 129 S. Ct. at 1949–50. Plaintiffs have, however, supplied the Court with somewhat more information about the

history of the area's political districting in their motion for injunctive relief. We have also considered those allegations for the purposes of deciding these motions.[9]

In Plaintiffs' motion for injunctive relief, they allege that, as far back as the 1990 redistricting process, the Michigan legislature has "considered splitting the Latino electorate in Southwest Detroit." They point out that, following a legal challenge to the 1990 plan on unrelated grounds, the Michigan Supreme Court eventually ordered a plan that kept the area intact, partly out of the court's "desire to preserve intact a concentration of [the] Hispanic population of southwest Detroit." *In re Apportionment of State Legislature*, 486 N.W.2d 639, 652 n.51 (Mich. 1992). They allege that similar proposals cracking Detroit's Latino-American community were raised by Republican-led legislatures in the state's next two redistricting cycles, but that those proposals were defeated, in part, out of concern that splitting the Latino-American community would trigger legal challenge.

These allegations, while somewhat more specific, are nonetheless insufficient to allow Plaintiffs to proceed beyond the pleading stage. The fact that similar proposals have been considered in the past does not indicate that those proposals were considered due to a discriminatory motivation. Indeed, even when pressed by this Court, Plaintiffs could provide no circumstantial or direct evidence of any kind that would tend to show that the district was split "because of" the legislature's desire to discriminate against the Latino-American community.[10] *See Personnel Adm'r. v. Feeney*, 442 U.S.

_____

[9]Although it is not clear that we are obligated under the Rules to do so, we have considered the facts alleged in Plaintiffs' motion for injunctive relief, both in order to construe their complaint in the light most favorable to their case and to determine whether an amended complaint that included those facts would survive the present motions. *See Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

[10]Indeed, the evidence presented by Plaintiffs shows that the 1990 and 2000 proposals that would have split the Latino-American community were ultimately rejected. In 2000, the legislative

16

256, 279 (1979) ("Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects."). The caselaw sets out a panoply of evidence that may show, either circumstantially or directly, that a redistricting plan was racially motivated. *See, e.g. Shaw I*, 509 U.S. at 646–47; *Gomillon v. Lightfoot*, 364 U.S. 339, 341; *Shaw v. Hunt*, 517 U.S. 899, 906 (1996) ("*Shaw II*"); *Miller*, 515 U.S. at 917 (inferring racial motivation from, *inter alia*, "bizarre" district shapes, unexplained variations in race and population densities, and voter behavior); *see also Cromartie II*, 532 U.S. at 254; *Vera*, 517 U.S. at 959; *Shaw II*, 517 U.S. at 906; *Miller*, 515 U.S. at 917–18 (finding that the following examples provided direct evidence of racial motivation: legislator's email referring to the transfer of voters in and out of districts based on the racial makeup of the voting-age population; state's concession that one of its goals was to create an additional majority-minority district; legislator's statement that the creation of majority-minority districts was the principal reason driving the redistricting plan). The fact that Plaintiffs failed to plead any such similar direct or circumstantial evidence cannot be ignored.

Accordingly, Plaintiffs' allegations are insufficient to raise a triable issue of fact as to intentional discrimination. Although we are sympathetic that this showing may be difficult to produce at the pleading stage, it is not impossible, and we cannot overlook Plaintiffs' failure to do so.

### 2. The Second and Third *Gingles* Preconditions – Political Cohesiveness and Majority Bloc Voting

---

amendment that kept the community intact was, in fact, passed unanimously. The plan ultimately chosen by the legislature is, of course, far more probative evidence of its intent than any considered, but rejected alternative.

For similar reasons, Plaintiffs have failed to plead *Gingles'* second precondition of political cohesiveness. Plaintiffs' allegations are limited to unadorned, conclusory statements that Latino-American voters are "politically cohesive," "have a common and distinct history, culture, and language," and "have organized themselves collectively for political activity." Even at the pleading stage, in the absence of any supporting evidence, we cannot simply accept Plaintiffs' bare assertions that the area's Latino-American community "share[s] the same characteristics, needs, and interests." *Fletcher*, 2011 WL 6740169 at *10 (citing *League of United Latin Am. Citizens*, 548 U.S. at 433). Although Plaintiffs need not present us with a full factual basis to support political cohesiveness, they are required to assert something beyond mere perfunctory statements.[11]

Finally, Plaintiffs have also not provided sufficient allegations to permit us to infer that their claim can plausibly meet *Gingles'* final precondition—that the majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate. In order to show a violation of Section 2, Plaintiffs must prove that the targeted minority group's "members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). However, Plaintiffs concede that, in at least one of the two districts in which the Latino-American population is now split under the Plan, the majority of the voting-age population is African-American. According to Plaintiffs' own arguments, Detroit's Latino-American population votes consistently with its neighboring African-American population. If true, Plaintiffs

_____

[11]For the same reason, Plaintiffs' claim would fail under a minority coalition theory, even if this Circuit permitted such Section 2 claims. The complaint does not provide any specific facts to plausibly allege that African-Americans and Latino-Americans vote cohesively. Accordingly, this Court has no basis on which to presume that these two groups would effectively operate as a minority coalition, as the second *Gingles* factor requires. *See Gingles*, 478 U.S. at 51 ("[T]he minority group must be able to show that it is politically cohesive.")

essentially concede that the community's preferred candidate would not be defeated by the African-American majority's bloc voting in that district. Coupled with the fact that both the MLBC's plan and the state's Plan arrive at the same number of majority-minority districts, we have been presented with no facts to infer that the Latino-American community is harmed under the current map.

### B.     Equal Protection

We next turn to Plaintiffs' claim that cracking the Latino-American community violates the Equal Protection Clause. In order to trigger strict scrutiny's more searching review, Plaintiffs must allege that the Plan contravenes equal protection because it "has no rational explanation" except as "an effort to separate voters on the basis of race." *Miller*, 515 U.S. at 903; *Shaw I*, 509 U.S. at 649.

As discussed above, Plaintiffs' unadorned allegations of discriminatory motivation are insufficient. Their complaint is devoid of facts that develop their allegation that the Plan is "illogical and illegal." Although they contend that Detroit's Latino-American community has faced private and official discrimination in the past, "including discrimination in attempting to exercise their right of franchise and to participate equally with other residents in the political process," these statements alone are too non-specific to suggest intentional discrimination and do nothing to combat Defendants' rational explanation for the legislature's districting decisions. Therefore, Plaintiffs' pleadings fail to make out a plausible claim that would trigger strict scrutiny. The Plan otherwise appears, on its face, to pass muster under rational basis review. Accordingly, we must grant the motions to dismiss Plaintiffs' equal protection claim related to the division of the Latino-American community.

## IV.    INCUMBENT PAIRING CLAIM

Plaintiffs' next claim argues that the Plan violates Section 2, the Equal Protection Clause, and

the Constitution's One-Person, One-Vote standard because the Plan pairs five of Detroit's ten minority incumbent representatives against one another, while it pairs only two of the state's ninety-six Caucasian incumbents against each other. Plaintiffs contend that, despite Detroit's population decline, these incumbency pairings were unnecessary. In support, they present the MLBC's alternative map, which they contend results in "no incumbency pairings" and which allegedly "scores higher" than the adopted Plan under Michigan's Apol standards.

### A.     Section 2 of the Voting Rights Act

Plaintiffs rely on two cases to support their claim of a Section 2 violation under an incumbent pairing theory. First, they cite *Cox v. Larios*, 542 U.S. 947, 948 (2004), a case which challenged a Georgia redistricting plan that fell just within the One-Person, One-Vote standard's guideline that districts not deviate more than 10% from their ideal population size. Upon review by a three-judge district court, the plan's population deviations, which varied by up to 9.98%, were found to be the product of unconstitutional, partisan gerrymandering. *Id.*; *see also Larios v. Cox*, 300 F. Supp. 2d 1320, 1321 (N.D. Ga. 2004) (per curiam) ("*Larios I*"). The three-judge court held, and the Supreme Court agreed, that even if the plan was technically compliant with the 10% standard, it was nevertheless the product of a facial effort to protect Democratic incumbents in certain underpopulated regions of the state at the expense of Republican incumbents' reelection prospects. *Id.* at 948. In affirming the three-judge court, the Supreme Court reasoned that district lines drawn with "no neutral justification in order to place two incumbents of the opposite party in the same district" are probative of "impermissible intent." *Cox*, 542 U.S. at 950. Ultimately, the case was resolved when the three-judge district court ordered a special master to redraw the state's maps. Among the changes directed by the court was that the plan pair fewer incumbents, including fewer of the state's African-American

incumbents. *See Larios v. Cox*, 314 F. Supp. 2d 1357, 1366 (N.D. Ga. 2004) ("*Larios II*").

Secondly, Plaintiffs cite to *Balderas v. State*, which challenged a state redistricting plan in Texas. *See Balderas v. State*, No. 6:01-cv-158, 2001 WL 34104833, at *1 (E.D. Tex. Nov. 28, 2001) (*per curiam*). *Balderas* outlines the three-judge court's limited adjustments resolving the federal constitutional and statutory defects of the state's plan. *Id*. at *2. Among the problems addressed were concerns raised by the Justice Department that the plan violated Section 5 by retrogressively reducing the number of Hispanic opportunity districts. *Id*. at *1. The court resolved this issue by reconstituting one majority-Latino without pairing two Latino incumbents, and by modifying another district to no longer pair a Latino incumbent against a Caucasian incumbent. *Id*. at *3.

Plaintiffs contend that *Cox* and *Balderas* prove that the pairing of minority incumbents may justify court-ordered relief under the Voting Rights Act. Defendants disagree, arguing that *Cox* and *Balderas* cannot support Plaintiffs' claim because neither case dealt with a claimed Section 2 violation. Defendants point out that *Cox*'s unpairing remedy was related to violations of Section 5 and the One-Person, One Vote standard and that *Balderas* also involved a Section 5 violation.

Defendants are correct that neither *Cox* nor *Balderas* squarely applies to Plaintiffs' claims. Moreover, they correctly note that Section 2's purpose is to protect the rights of voters, not the rights of elected representatives. Accordingly, a claim based on a representative's race does not prove that a redistricting plan was racially gerrymandered to the detriment of minority voters.

Defendants err, however, in presuming that these distinctions render incumbent pairings inapplicable to the Section 2 context. The courts have repeatedly acknowledged that the state has a legitimate interest in avoiding incumbent pairings as one of the recognized "traditional districting principles" that inform the redistricting process. *See Shaw I*, 509 at 647 (recognizing "respect for

political subdivisions" as a traditional districting principle); *Karcher*, 462 U.S. at 740 (describing the avoidance of contests between incumbent representatives as a "consistently applied legislative polic[y]"). While this acknowledgment does not necessarily compel the state, either by virtue of Section 2 or by the U.S. Constitution, to avoid incumbent pairings, it nevertheless is an objective factor bearing upon whether the "totality of circumstances" shows that the district has been gerrymandered on racial lines. *See Shaw I*, 509 U.S. at 647, 662 n.2 ("[T]hese criteria are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines.") (internal citation omitted).

Regardless, in order to base a Section 2 violation on an incumbent pairing theory, Plaintiffs must at least establish a sufficient link between the elimination of minority incumbents and the dilution of the minority vote. Construing their complaint liberally, Plaintiffs' claim could be understood as an attempt to raise a "packing" theory of voter dilution.

A cousin to voter cracking, voter packing occurs when a redistricting plan excessively concentrates the minority vote into a single or small number of districts to create districts where the minority comprises a super-majority. By doing so, packing dilutes the minority's ability to spread its influence among multiple, neighboring districts. *See Fletcher*, 2011 WL 6740169, at *8 (citing *Voinovich*, 507 U.S. at 153). If the packing of minority incumbents into single districts indicates that the minority vote has also been impermissibly packed, then Plaintiffs may have asserted a viable theory under Section 2.

As with a Section 2 cracking theory, a claim based on voter packing requires the plaintiff to first establish the three *Gingles* preconditions. *Id*. at *24. Defendants challenge a combination of the

first and third factors—whether Plaintiffs have shown that they could create an additional majority-minority district and whether the Plan enables the majority bloc to defeat the minority's preferred candidates.

First, Defendants argue that Plaintiffs have not alleged that the MLBC plan, or any other, could create additional majority-minority districts over the ten that are created under the current Plan. Second, Defendants point out that while the Plan pairs multiple incumbents in certain districts, it also leaves three other districts without an incumbent, which leaves open the possibility that the paired incumbents are free to move to another district where they would not face such a challenge. Finally, Defendants argue that Plaintiffs' ability to furnish an alternative map that also complies with requisite redistricting principles does not, by its own force, prove that the enacted Plan violates Section 2. On all these points, we find Defendants' arguments persuasive. Accordingly, we hold that Plaintiffs have not raised sufficient allegations to show how the minority vote is packed or otherwise impermissibly gerrymandered by virtue of the incumbent pairings.

This conclusion holds even when considered outside of the *Gingles* factors. As *Gingles* recognizes, the "essence" of any Section 2 claim is that the challenged map results in a political process that is "not equally open to participation" by minority voters, such that those persons "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 46–47 (citing 42 U.S.C. § 1973(b)). Plaintiffs seize upon the language "representatives of their choice" to argue that certain voters will be deprived of their right to vote for the particular incumbent of their choice by virtue of the incumbent pairings. This interpretation misreads Section 2. The Voting Rights Act protects minority voters' equal participation in the political process; it does not grant minority voters the unique power to pick the

individual candidate of one's personal preference. If that were the case, any minority voter shifted from one district to another during a redistricting, regardless of whether that shift diluted the voter's ability to participate equally in the voting process, would be able to bring a potential Section 2 claim.[12] Accordingly, the fact that another incumbent may not be the preferred candidate of a particular voter or group of voters does not, per force, indicate a decreased ability to participate in the political process. In short, Plaintiffs' claim cannot allege a cognizable harm protected by Section 2 under this theory.

Finally, we also note that Plaintiffs failed to identify the races of the affected incumbents and failed to provide the Court with a full description of the racial makeup of the affected districts.[13] Without this information, it is impossible for us to draw a link between alleged racial gerrymandering of the districts and the races of the districts' representatives. Accordingly, we find that Plaintiffs have failed to raise a plausible Section 2 claim based on the incumbent pairings.

### B. Equal Protection

Plaintiffs next argue that the Plan violates equal protection because it pairs a disproportionate number of minority incumbents as compared to their majority counterparts. As an initial matter, the equal protection doctrine requires that the compared classes be "similarly situated." *See City of*

---

[12]Consider, as a hypothetical, an African-American voter shifted from one minority-majority district into another minority-majority district by virtue of a state's redistricting plan. Although that voter would no longer be able to vote for the particular incumbent representative from his or her former electoral district, the voter would retain, absent a totality of the circumstances to the contrary, his or her equal opportunity to participate in the political process as protected under Section 2.

[13]This Court did, however, take judicial note of the candidates' race by virtue of publicly available information. While Plaintiffs' motion for injunctive relief provides charts detailing some of information about the affected districts, the charts conspicuously lack a full racial breakdown of each district. This incomplete information leaves the Court to speculate as to whether the unaccounted for remaining percentages are comprised of Caucasian or majority voters.

*Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Plaintiffs, however, ask us to compare apples to oranges.  Incumbents representing the City of Detroit—the area of Michigan hardest hit by the population exodus—are in significantly different positions than are the incumbents that represent the remainder of the state.  Obviously, incumbents are more likely to be paired in the area of the state that has suffered the greatest population decline.  Plaintiffs' ill-drawn comparison alone renders their equal protection claim flawed from the outset.

Even if we could overlook this issue, Plaintiffs must still show "proof of racially discriminatory intent or purpose" to succeed under an equal protection theory. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).  That evidence may be indirect or circumstantial, provided that it at least demonstrates "a clear pattern" of government action that is "unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266.

Plaintiffs' allegation of discriminatory intent is limited to a single paragraph that "[t]he purpose and effect" of the state's pairings "is to prevent African-American voters in the City of Detroit from exercising their right to elect candidates of their choosing."  This allegation, devoid of factual development, cannot sustain Plaintiffs' claim under *Iqbal*.  Although Plaintiffs also broadly contend that African-Americans in Detroit have faced both private and official discrimination and that the legislature's map "lacks sufficient justification," these types of broad sweeping allegations are unpersuasive, even at this stage of the Court's review.  *See Iqbal*, 129 S. Ct. at 1949.

Finally, Plaintiffs claim that the MLBC's map "scores better" than does the state's map on Michigan's Apol factors.  To begin with, Plaintiffs are not clear as to what they mean by "scoring" the Apol criteria, as the statute does not indicate that the criteria are scored by any numerical or

otherwise objective standard.  Additionally, even if Plaintiffs have presented a plan that is "better" under the Apol factors, the legislature is not required to enact the "best" plan; its only obligation is to enact a plan that complies with federal and state requirements.  Plaintiffs do not claim that the Plan disregards the Apol factors or that it subordinates them to racial considerations.  *See Miller*, 515 U.S. at 916.  Accordingly their proof of a viable, alternative proposal—while perhaps necessary to show that the harm alleged is capable of being remedied—is not sufficient to overcome the presumption that the state acted in good faith and without discriminatory intent when it drew the enacted Plan.  *See id.* at 915.

### C.      One-Person, One-Vote Standard

Finally, Plaintiffs allege that the incumbent pairings violate the Constitution's One-Person, One-Vote standard.  However, a One-Person, One-Vote claim is a relatively narrow legal challenge that asks us to consider whether the districts are equally populated.  Plaintiffs provide no information on this matter in their pleadings, but their motion for injunctive relief shows that the challenged districts all fall within a relatively narrow band of population variance—negative 0.28% to negative 2.78%.  These variations are not only far beneath the 10% threshold established under federal standards, but they also appear to comply with Michigan's more stringent Apol standards.  *See Brown*, 462 U.S. at 850 (O'Connor, J., concurring); Mich. Comp. Laws § 4.261(1)(d), (i).

Moreover, the population variances may be justifiable if they were necessary to accommodate other traditional redistricting factors, such as compactness, respect for municipal boundaries, preserving the cultures of prior districts, and so on.  *See Cox*, 300 F. Supp. 2d at 1331 (quoting *Karcher*, 462 U.S. at 740).  Plaintiffs have raised no facts in their pleadings to suggest that traditional redistricting principles are not the cause of the Plan's minor population deviations.  Accordingly,

Plaintiffs have failed to state a claim of a One-Person, One-Vote violation.

## CONCLUSION

In deciding these motions, we remained mindful of the importance of the issues presented by this case and that we are considering the case at a relatively early stage of litigation. However, as was made clear by the pleadings, legal memoranda, and arguments before the Court, Plaintiffs' allegations are facially insufficient to support the legal theories they raise and are otherwise too factually underdeveloped to proceed past the pleading stage. Therefore, we hereby **GRANT** Defendants' Motion to Dismiss and **GRANT** Intervening Defendants' Motion for Judgment on the Pleadings. The remaining outstanding motions are **DENIED** as moot.

The clerk is directed to **DISMISS** the case.

**IT IS SO ORDERED.**

ENTER: April 6, 2012.

/s/_____
ERIC L. CLAY
United States Circuit Judge

/s/_____
BERNARD A. FRIEDMAN
United States District Judge

/s/_____
PAUL L. MALONEY
United States District Judge